BRUSH (WARE v.). See Case No. 17,171

---

## Case No. 2,060.

### The BRUTUS.

#### [2 Gall. 526.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1815.

PRIZE—PRIVATEER — AGREEMENT BETWEEN OWNERS AND CREW—CRUISE — COMMENCEMENT AND TERMINATION.

1. By the shipping articles of a privateer, it was agreed that the privateer should cruise, where the owners should direct, and that three fifths of the prizes taken during the cruise should belong to the owners, and two fifths to the crew; and that the officers and crew should repair on board immediately when ordered, and should remain for three months from the time of sailing, unless the cruise was sooner completed in the opinion of the owners. The privateer sailed on the cruise, and was compelled to go into France for repairs, in consequence of injuries received in an engagement, and by stress of weather. While in France the three months elapsed, and the crew refused to remain by the ship, unless new articles were signed for a second cruise. On the homeward voyage, after the new articles were signed, captures were made. It was held, that the cruise was not legally broken up in France, and that the assignees of shares on the original cruise, and the officers and crew, who were put on board of prizes captured on the outward voyage, were entitled to share in the prizes made after the departure from France.

[Cited in Robinson v. Hook, Case No. 11,956.]

2. A cruise, ex vi termini, imports a definite place, as well as time of commencement and

¹ [Reported by John Gallison, Esq.]

termination, unless that construction be repelled by the context. When it is not otherwise specially agreed, a cruise begins and ends in the country, to which the ship belongs, and from which she derives her commission.

[Cited in The Sarah Jane, Case No. 12,348.]

3. A cruise for three months means, that three months only shall be employed in cruising, and not that the engagement for the cruise is then, to all intents and purposes, to terminate.

4. A cruise, like a voyage, begins in legal contemplation, when the ship breaks ground for the purpose of sailing.

5. When the term of time once begins to run, it is not suspended by any intermediate accident or casualty happening in the course of the cruise.

[Appeal from the district court of the United States for the district of Massachusetts.

[In admiralty. Libel by Woodbury and others against the privateer Brutus for the distribution of the proceeds of prizes. There was a decree for libellants in the district court (case unreported), and the respondents appeal. Affirmed.]

The material facts in this case were as follows: The private armed schooner Brutus, William Austin commander, being fitted for a cruise; about the third of October, 1814, shipping articles were entered into by and between the owners, and the commander, officers and crew of the privateer, among which were the following stipulations: "1. The schooner shall cruise, where the owners or a majority of them, may direct. 2. Three fifths of the net proceeds of all the prizes and prize goods, taken during the cruise, are to belong to the owners; the other two fifths to belong to the captain, officers and crew, and to be divided among them according to the number of shares set against their names. 3. No one of the company shall, before the end of the cruise, sell more than half his shares. 4. The captain, officers and crew, agree to repair on board immediately, when ordered, and to remain for three months from the time of sailing, unless the cruise is sooner completed in the opinion of the owners." The privateer sailed from Boston on the cruise, on the first of November, 1814, and was, on the same day, chased by the enemy's ships into Salem, from which port she sailed again on the cruise on the eighth day of the same month. Several prizes were made and manned out, and at length the privateer, having been considerably injured in her spars and rigging by violent gales of wind, and by damage sustained in an action with an enemy's ship, which was captured, was compelled to put into Quimper in France for repairs, and arrived there on the first day of January, 1815. Notwithstanding every exertion was made, the necessary repairs were not completed until the fifth day of February following. In the mean time, the crew gave notice to the captain, that their term of service would

expire on the first day of February, and that they should not hold themselves bound to remain after that day, unless a new engagement was made for a second cruise. The captain made application to the American consul at that port, on this subject, and was informed that the crew could not be retained under the articles. In consequence of these circumstances, the captain was induced, on the 26th of January, to put an end to the first cruise, and to make and execute shipping articles for a second cruise of three months from the time of sailing from the river of Quimper, unless the cruise should be sooner abandoned by the commandor. The whole of the crew then on board, excepting two officers, signed the new articles; and one new officer and fifteen other men were shipped, to make up the proper complement. The privateer sailed from Quimper on the second cruise, and in the course of it, captured two valuable prizes (the last capture having been made on the second day of March, 1815), and afterwards safely arrived in the United States. The captain of the Brutus, previous to his sailing from Boston, received orders from the owners respecting the places, where he was to cruise, and authorizing him to exercise his own judgment in respect to it, after consulting his officers. He was further authorized, in case he went to France, and should think it proper to break up the cruise there, to convert the Brutus into a letter of marque, and bring home a cargo to the United States. He did not, however, act at all under this last instruction.

The present was a supplemental libel, filed by the libellants, to compel a distribution of the proceeds of the prizes made in the second cruise, which proceeds were, at the time of filing the same libel, in the registry of the district court. The libellant, Woodbury, was a prizemaster on board of one of the prizes, made by the Brutus on her first cruise, with which he safely arrived in the United States about the 7th of February, 1815, and was utterly unable again to rejoin the privateer. The other libellants were assignees of the shares of some of the original crew under assignments executed at Boston, before the sailing of the Brutus on the cruise. These assignments were substantially alike, and granted the share, "of all the moneys, goods, merchandises, effects and proceeds whatever, which may be lawfully captured, seized or recaptured by the private armed vessel or schooner, called the Brutus, William Austin commander, during the cruise, on which she is now bound, &c." and they contained an irrevocable letter of attorney respecting the premises.

Gallison, for libellants.

1. Were the captures, made by the Brutus after sailing from France, made during the cruise, on which she was bound at the time of executing the instruments of assignment? The cruise continued until the return of the vessel to the United States, unless it was sooner terminated, either by the owners, or some one having authority from them; or by some original limitation. It is not pretended, that the owners, by any act of theirs, interrupted the cruise. Had then the commander authority to terminate it, derived from his instructions, or from his office as commander? The instructions, it is evident, gave him no authority to terminate the first cruise, for the purpose of commencing a second. His general power as commander could not extend to such an act, because: 1. He is one of the parties contracted with by the owners in the first articles, and could not, of course, release himself from the obligation of those articles. He, therefore, at least, continued to sail under the first contract. 2. To suppose such an authority in him, is to suppose him to have the power of making an agreement, binding on the owners, by which they should receive but one tenth, or any smaller share, instead of three fifths of the prizes. 3. A commander has authority to ship new sailors, and even an entire new crew, if necessary, but not to undertake a new cruise or voyage without express instructions. 4. If he had authority to commence a new cruise in France, he might have done the same at sea. The owners, therefore, not having assented to the second contract, it was void. The case is analogous to that of partnerships prolonged beyond the stipulated time. Wats. Partn. 381; Keane v. The Gloucester, 2 Dall. [2 U. S.] 39.

2. Did the original cruise expire in France in consequence of the fourth article in the contract, under which it was commenced? The true construction of this clause is, not to fix a period to the cruise, which in its nature is not susceptible of so exact a definition of time; but to avoid an inconvenience, which had sometimes been experienced, by giving to the owners an option, in case of the vessel's return within three months, either to send her abroad again, or then to terminate the cruise. The contract of the seamen must be understood to be, "to serve three months, at least, if required; and till the end of the cruise;" and it was probably intended, that the return should be as soon as convenient, after three months. Any other construction would lead to absurd consequences, equally inconvenient to the seamen and to the commander. But admitting the respondents' construction to be correct, and that the cruise, or time of service, is limited to three months; still, it is contended, the prescribed time had not expired on the fifth of February, when the Brutus sailed from Quimper, nor even on the second of March, when she captured her last prize. For the time spent in France, in necessary refitting, is not to be accounted a part of the three months. It was a suspension of the cruise arising from inevitable accident. Very little can be found in English books upon this subject, but in

the French code the rule is distinctly laid down.[2] Reason, as well as the authority of the French law, will lead us to conclude, that if any limitation was intended, it must have been three months of effective cruising. It may further be contended on behalf of the assignees, that they ought not to be affected by any provision in the contract between the seamen and the owners. Of the contents of this contract they might have been, and probably were, ignorant. They would necessarily understand the word "cruise" in its popular sense, as extending to the return of the vessel to the United States. With regard to the prize crews, it would be peculiarly hard and inequitable, that they should be excluded from a share in the only valuable captures made during the expedition, because they happened to be detached from the ship on a service, which was for the common benefit. The Frederick & Mary-Ann, 6 C. Rob. Adm. 213.

J. T. Austin, for respondents.

The prize master did not actually, or constructively, belong to the Brutus, at the time when the captures were made. The cruise, upon which she was then sailing, was not the same with that, for which he had shipped. By the prize act (Act June 26, 1812, [2 Stat. 759]), the owners, officers and crew of the privateer may make such contract, as they please, for the division of prizes and the continuance of the cruise, and there is nothing to restrict them from expressly agreeing to terminate the enterprise in a foreign port. In the present case, the parties have entered into a written contract, by which they have engaged, not for an indefinite cruise, nor for one limited by place, but for a service defined and limited by time. In what manner such a service is to be understood appears from the case of Syers v. Bridge, 2 Doug. 530. It is not denied, that the commander terminated the cruise in France, if he had power so to do, and if his authority was reasonably exercised. His power is not questioned by the owners, who, indeed, have ratified his conduct. It cannot therefore be questioned by the other officers and the crew. The facts show, that the authority was reasonably exercised. The com-

mander used every exertion to fit his vessel for sea before the time expired. He could not accomplish it, and he would have been abandoned by his crew, if he had not made the contract for the new cruise. It is not material to the present question, whether the commander has power to commence a new cruise, or not. The only question is, whether the first cruise had expired. There was, however, a new cruise, with a crew different from that, which had been employed in the first. Had the Brutus returned to the United States, and sailed again, immediately after the expiration of the three months, with the same crew; it is not pretended that the men, who were on board of prizes, or in prison in the enemy's country, would have been entitled to share in the proceeds of prizes taken after such second sailing. Yet the hardship would not have been less in that case, than in this. As to the assignees, the only question is, to what benefit were the assignors entitled under the first contract? They have assigned only their earnings for three months.

Dexter, on the same side.

The claims of assignees are not deserving of any favorable regard. In general, for a very trifling consideration, they seek to share in advantages procured by the labors and dangers of others, and to reap the harvest, which was sown without their care. In the present case, there are many circumstances, independent of the written contract, to oppose their pretensions. But that contract will, it is believed, be found conclusive.

1. The argument on the other side has proceeded on the supposition, that the engagement in this case was for a cruise. But the undertaking is not, to cruise for three months; it is, to continue on board for that time, which can leave no doubt as to the intention. A portion of the time spent, it is said, ought not to be accounted a part of the limited period. But why not, we may ask, when the contract is "to continue on board" three months? What difference can it make, whether the ship be in port or not? When did the three months commence? Certainly, when the men were ordered on board in Boston. In a case of insurance, this voyage would undoubtedly be considered to commence at the moment of breaking ground. The whole object of the foreign ordinance, which has been read, is to fix limits to an uncertain and indefinite contract. It cannot apply to a case, where there is an express agreement. The case from Douglas shows, that Lord Mansfield considered a cruise for a specified time, as limited to the precise time agreed on.

2. The contract is not absolute even for three months. The owners had power to terminate it within that period. Now a great variety of events may happen, in which the exercise of this discretion by the owners would be expedient, or even necessary. It is not to be supposed, that in all cases they

---

[2] Declaration of the 1st of March, 1781, art. 21. "Les engagemens pour la course ordinaire, s'il n'y a pas de convention contraire, y compris le temps des relaches, seront de quatre mois, a compter du jour que le vaisseau mettra a la voile, et doublera les caps ou pointes, qui, suivant les usages locaux, determinent un depart absolu; exceptons toutefois les relaches necessaires pour amener des prises, prendre des vivres, faire de l'eau, espalmer, ou d'autres cas pressans; a la charge de remettre en mer aussi-tot que le vent le permettra." 2 Code des Prises, 920. This is substantially a re-enactment of the ancient ordinance of Nov. 25, 1693, art. 5. 1 Code des Prises, 147. But the old ordinance allowed only fifteen days for any stop to procure provisions, &c. See, also, 2 Val. 231; 2 Code des Prises, 641; 2 Valin des Prises, 38; 2 Emer. des Assur. 10.

are to decide in person. Circumstances, requiring their interposition, are more likely to take place abroad, than in a port of the United States. The commander, therefore, as their agent, must determine, when it becomes expedient to break up the cruise. There is no question here, that the commander acted reasonably, if he had the power; and having, without fraud or corruption, declared the contingency to have happened, which was to terminate the first cruise, it ceases to be of any consequence, whether the second cruise was lawfully commenced or not. I should, however, rely, with much confidence, on the instructions, as giving to the commander a discretion broad enough for this purpose. There is no reason to apprehend the mischiefs, which have been supposed to flow from our construction of the contract. The law would imply an obligation, independent of all stipulations, which would save the property from being abandoned to destruction in cases of extreme peril. In the present case, it is certain, that no danger existed.

Prescott, in reply.

Two distinct classes of claims are asserted in the libel now before the court, that the prize-master, and those of the assignees of prize shares. In general, however, the same reasoning will apply to both. The first question is, what is assigned? To ascertain the meaning and extent of the language used in the instruments of assignment, we must resort to our knowledge of the common mode of transacting similar business. The assignees must have supposed themselves purchasing a right in a cruise from the United States, in the sense in which that term is generally understood. There was no copy of the articles in the hands of the seamen, and without notice of some special clause, there was no reason for the assignees to wish an inspection of those articles. Was it possible they should suppose, that this vessel would go to a foreign country, at a time when all countries, but our own, were at peace with Great Britain, there to disband one hundred seamen, and to refit for another cruise?

But, it is said that the cruise was actually terminated in France. This point is material, because no new cruise could be undertaken until the first was properly ended. It is argued, that a new cruise was commenced, because the seamen shipped anew after the expiration of their first contract. But how was the first contract dissolved? Was it competent for the commander, one of the parties to that contract, to put an end to its obligation without the concurrence of the owners, whose interests were distinct, and might be so materially affected? It is not necessary to spend much time in considering, whether, as commander of the privateer, he had authority to break up the cruise, and to commence a new one. No

such power is ever considered to belong to the master of a merchant vessel. It would expose the owners to the loss of the whole expense of outfits; and they would have no security, that by the new contract, which the commander might make in a foreign port, their share in the prize proceeds would not be materially reduced. Had he then any such authority from his instructions? Nothing can be more improbable, than that the owners should give such a power, nor are their words to be so construed, unless the inference be necessary and direct. Upon looking into the instructions, we find, that so far from this, the commander is directed, if he should think it for the owners' interest, "to give out that he is a letter of marque, &c." and "to favor this idea by taking on board goods." No power is given to break up the cruise in fact, or to convert the vessel into a letter of marque. Some reliance has been placed on a clause directing the commander, in cases of doubt, to consult with his officers, and then to act, as he may think best; but it cannot be supposed, that by this it was intended, that he should consult them concerning subjects, in which they had a direct interest contrary to that of the owners. It is contended, that whether the commander had such power or not, yet the contract expired by its own limitation at the end of three months, and the men had then a right to leave the ship. This, if true, could not alter the rights of the assignees, supposing the fair import of the word "cruise" to comprehend both the outward and homeward voyage, for the cruise is not necessarily commensurate with the term of service. But the articles will not admit such a construction. There is no stipulation, that the crew shall be discharged at the end of the time. They engage to serve three months, unless the cruise is sooner completed in the opinion of the owners. This shows an expectation, that the cruise was to end in the United States. The construction, therefore, must be, that they were to serve three months if required, and until the end of the cruise. It is said, they bind themselves only to "remain on board" so long; but are they not to remain for the purpose of cruising? In construing the contract, its object must be taken into view. The vessel was to go into the Atlantic, and on the coast of Europe. If the time should expire while she was at sea, were all the obligations of the contract at once to cease? Were the crew released from the command of their officers? Had the commander a right to put the crew on shore, in any place he might think proper? The clause was probably intended to fix generally the duration of the cruise. At the end of the time, the crew might insist upon returning, but they must continue to serve until arriving in the United States, and if a prize should be taken on the passage homeward, it would be distributed according to the articles. But the three months had not

expired at the time when the captures were made. The rule of the French law, as the rule of a great commercial country, is entitled to much respect. The ordinance limits the duration of the cruise to four months, in the absence of any express limitation, and this limitation is as effectual as if made by the contract. Yet the time spent in port is excepted out of the limited time. This is reasonable and just, for the owners are liable to great expenses, which continue while the vessel is in port; and for these their only compensation is the chance of making captures. If the time of service should be considered as expiring in a foreign port, the whole benefit of the expedition might be lost.

STORY, Circuit Justice. This cause has been argued with great ability on both sides. The questions involved in it are of considerable difficulty, and it is to be regretted, that so little light can be gleaned from authorities, to assist in the decision, which is now to be pronounced. We are called upon, in the first instance, to put a construction upon the shipping articles. These, like all other mercantile instruments, are drawn up in a very lax and inartificial manner. To construe the language by the technical rules of literal interpretation would be to defeat the manifest intention of the parties. We are, therefore, bound to construe it with great liberality, and to look to the general scope and object of the instrument, rather than to weigh minutely the force of detached expressions. "In conventionibus, contrahentium voluntatem, potius quam verba, spectari placuit." 3 Poth. Pand. 825.

It is argued, in behalf of the respondents, 1. That this was an engagement for a marine service limited solely by time; and that it was not even an engagement to cruise for three months, but simply to remain on board the ship three months. 2. That if it should be construed to be an engagement for a cruise, it was a cruise not measured by place, but simply by time; and that "cruise" ex vi termini, imports the period of time, during which a vessel is engaged on the ocean, for the purpose of making captures, without any return into port. To support the first position, great stress is laid on the stipulation of the officers and crew to repair on board, "and to remain for three months from the time of sailing, unless the cruise is sooner completed in the opinion of the owners." But it is manifest, that the parties understood the engagement to be for the purposes of cruising. The prizes captured, "during the cruise" were to be divided in a certain ratio among the crew; and this certainly refers to prizes made during the term of service of the crew. "The cruise" might be determined by the owners before the expiration of the three months; and how could this be, if the parties had not engaged for "a cruise"? Besides, if we were to adhere to a literal construction of these words, it would lead to the most singular incongruities. If it were a sufficient compliance with the stipulation "to remain" on board, how were the ordinary or extraordinary duties of cruisers to be performed? How were prizes to be captured and manned out and navigated into port? So far, indeed, from its being the intention, that all the crew should "remain" on board, during the stipulated term, it was in the obvious contemplation of the parties, that a part were to leave the privateer and man prizes. For what other purpose could there be prize-masters on board? I cannot, therefore, but construe the contract to be for a cruise of three months, commencing from the departure of the privateer from the port of equipment; and such an engagement includes a liberty to cruise during the whole stipulated term.

And this leads us to the consideration of what is the true meaning of the word "cruise," as used in the connection, in which it stands in the shipping articles. By a cruise, I understand a voyage for the purpose of making captures jure belli. Lord Mansfield, in the case cited (Syers v. Bridge, 2 Doug. 527), has said, that it is a well known expression for a connected portion of time. This language is used with reference to a policy then before him, containing a "liberty to cruise six weeks," which, it was contended, meant a cruising for six weeks not merely in succession, but at distant intervals, if the aggregate time did not exceed that space. His lordship is not, therefore, to be understood to assert, that a cruise ex vi termini includes a given portion of time, without reference to the place of commencement or termination, but only that it includes a connected portion or immediate succession of time, in whatever manner the same may be calculated. And this is true also as to a voyage. The boundaries of a cruise, like those of a voyage, may be defined by local limits, or by artificial time, or by both combined. It is just as competent to engage on a cruise from Boston to the East Indies and back again, as on a cruise for a year. It is true, that the term "voyage" is frequently applied to the passage of a ship from one defined port to another (Marsh. Ins. b. 1, c. 6, § 1); but it is also sometimes used with a more obscure reference to place, and with a direct limitation of time. Cases are familiar of an insurance for a limited time on a fishing voyage, or coasting voyage, or on any voyage or voyages, without any specification of place. 1 Emerig. Ins. c. 3, § 2, p. 63; Casar. Disc. 1, note 127; 2 Valin, Comm. 86, b. 3, tit. 6, art. 85; Casar. Disc. 67, note 31. In the same manner an insurance may be on a privateer for a cruise, or for a cruise of a limited period. In short, a cruise is nothing but a voyage for a given purpose (see Brown v. Jones [Case No. 2,017]; Douglass v. Eyre [Id. 4,032]; Magee v. Moss [Id. 8,944]; 1 Hall, Law J. [N. S.] 207; Abb.

Shipp., 7th Lond. Ed. 1844, pt. 5, c. 1, p. 605), and may, therefore, be properly defined to be a cruising voyage, or voyage to make captures jure belli; and so it is clearly considered in our statutes (Act June 26, 1812, c. 107, § 10 [2 Stat. 761]). And a cruise, like a voyage, imports a definite place of commencement and termination, unless that construction be repelled by the context. If seamen engage to go from a port on a fishing or whaling voyage, this includes not merely the period, in which the vessel is engaged in the fisheries, but also the return voyage to the home of the vessel. This construction results by necessary implication, either from the known usage of the ordinary trade, or from a legal presumption of the intentions of the parties, made to obviate great inconveniences, or apparent absurdities. It is considered as a casus omissus, in which the law steps in, and in furtherance of the apparent objects of the parties, or of public policy, supplies the omission by a reasonable interpretation and extension of the contract in unforeseen emergencies. The same doctrine applies, in the same latitude, to a cruise. If no provision is made to the contrary, it must be presumed that a cruise comprehends a return to the country, if not to the home port, of the privateer. This is the ordinary usage of the employment, and the manifest expectation of the laws. It comports with the known policy of the country, which is unfavorable to the discharge of our seamen in foreign ports; and subserves the most important public, as well as private interests. I reject, therefore, altogether the definition of a cruise, which would strike out all reference to place in respect to its termini; and I further hold, in conformity with the language of the prize statute (Act June 26, 1812, c. 107, § 10 [supra]), that a cruise may still have a continuance, notwithstanding an arrival in port, and is not necessarily extinguished thereby, unless such inference result from the express stipulations, or the overt acts of the parties.

It being then settled, that a cruise imports a return voyage to the country or port of the domicil of the ship, unless that construction be repelled by the context, we are next led to the consideration, whether in the present contract there be any thing to repeal that construction. The parties have limited the commencement of the cruise to the departure from the port of equipment; and from the facts it seems clear, that the cruise legally commenced on the first day of November, when the Brutus left Boston. I cannot adopt, in this respect, the opinion of the learned judge of the district court, postponing the commencement until the departure from the port of Salem. That opinion seems to have proceeded upon the rule of a foreign ordinance (Ord. 1778, art. 21; 2 Emer. des Assur. c. 13, § 1, p. 10), which fixed the commencement of the cruise from the doubling of the capes, or points of usual departure. "Qu'il a double les caps ou pointes, qui suivant les usages locaux determinent un depart absolu." 2 Emer. des Assur. 10. The general rule of our law, like that of the civil law ("In nautica pecunia, ex ea die periculum spectat creditorem, ex quo navem navigare conveniat." 3 Poth. Pand. 826, note 1594), is that the voyage commences, when the ship breaks ground for the purpose of departure; and the parties have here expressly fixed it to the time of sailing. The term stipulated in the articles therefore expired, by its own limitation, on the first day of the ensuing February. If at that time the privateer had been in a port of the United States, in the ordinary course of the cruise, it is incontestable, that the officers and crew would have been absolved from any further service. On the other hand, if the privateer had returned within the term, unless the owners had exercised the election given them, the articles would have subsisted in their full obligation.

But it is argued by the plaintiff's counsel, that the privateer having been forced into France for repairs occasioned by inevitable accidents, the whole time consumed there in necessary repairs is to be deducted from the account of the cruise. In other words, the running of the term is to be considered as suspended during that period. And they rely on the regulations of the French ordinances to support their position. Ord. 1693, art. 5; 2 Valin, Prises, 38; 2 Valin, Comm. 231; 1 Code des Prises, 147; Ord. 1778, art. 21; 2 Emer. des Assur. c. 13, § 1, p. 10; Ord. 1781, art. 21; 2 Code des Prises, 641, 920. These ordinances seem highly reasonable in themselves; but in the terms, in which they are conceived, they are rather positive municipal regulations, than evidence of the general maritime law. A class of cases more pointed to the purpose of the plaintiffs is that of licenses, granted during war to carry on an interdicted trade. There, it has been held, that if the license be for a limited time, and the party is prevented by superior force, or by the fury of the elements, from completing his voyage within it, he shall still be entitled to its protection. While the party is baffled by these obstructions, the intervening time is held, as it were, annihilated, and he is put again in possession of the time so lost. The Goede Hoop, Edw. Adm. 327. This construction is founded upon a large and liberal exposition of the intentions of the government, and in furtherance of a great national policy. But it will be difficult to show, that the same rule has ever been adopted either in the common or the maritime law in respect to civil rights, or contracts between citizens.

The general principle of the common law is, that when a term of time begins to run against a party, it is not suspended by any intervening casualties. This doctrine is familiarly applied to statutes of limitation,

where no exception is admitted, unless it stand in the text of the statute book. It is also applied in relation to civil contracts upon time, where no excuse is allowed for non-performance according to the terms of the engagement. And a striking illustration of the same principle may be seen in the maritime law, where it is held, in an insurance on time, that no intervening accident suspends or enlarges the stipulated period of the policy (1 Emer. des Assur. c. 3, § 2, p. 63; 2 Emer. des Assur. c. 13, § 1, p. 5; Casar. Disc. 1, note 178; Id. 67, note 31; Poth. Assur. note 62; Ord. de la Marine, tit. 6, art. 34), and in the analogous cases of warranty to sail on a particular day, (Hore v. Whitmore, Cowp. 784; Marsh. Ins. b. 1, c. 9, § 4), and covenants in charter parties on time (Shubrick v. Salmond, 3 Burrows, 1637; Abb. Shipp. pt. 3, c. 1). The maxim, that an act of Providence shall work no prejudice to any one, has not been supposed to apply to such cases, because each party might properly avail himself of the same shelter. As, therefore, in analogous cases, neither the common nor the maritime law affords any relief, and cannot be drawn in aid of the argument from the French code, I feel myself bound to adhere to the strict rule of the contract. "Lapso tempore, extincta est materia obligationis, et consequenter obligatio, quia post tempus alia est materia alia res." 2 Emer. des Assur. 8. As therefore, the fortuitous occurrences did not enlarge the term, or suspend the efflux .of its time, it follows that it expired, by its own limitation, on the first day of February. But the principal difficulty still remains. For, admitting that the term stated in the articles expired, it does not follow that the cruise, in legal contemplation, was determined. What effect a limitation of time engrafted on a contract for a cruise shall have, is a question of no inconsiderable moment and intricacy. Is it to be construed as forming a terminus of the cruise, altogether independent of the place where it elapses, as the respondents contend? or is it to be construed as a mere limitation of the time, in which the privateer is to be engaged in cruising, and of course, at the end of the term, to compel the parties to an immediate return home, as is maintained by the libellants? This is one of the turning points of the cause.

If the doctrine of the respondents be well founded, it will follow, that after the lapse of the stipulated term, the crew may abandon the ship, or be abandoned immediately on the broad ocean, or in a desolate island. Let the event happen where it may, there will immediately ensue a complete dissolution of all authority, responsibility, and subordination, on board of the ship. There will be no longer officers or crew; for all parties will be equally, to all intents and purposes, functi officio. These would be mischiefs of a most enormous character, and it is impossible to believe, that reasonable men could ever intend that any contract of theirs should seriously receive an interpretation, that would lead to such a result. It may be said, that these evils could be of very rare occurrence. But the fact is, that from the very nature of the service, and the dangers and difficulties, with which it is encompassed on every side, from the irresistible force and fury of the elements, as well as the vigilance and activity of the enemy, it would be impracticable, for the most prudent and cautious men, to guard against an overrun of the stipulated period. Nor is it any answer, that the common principles of humanity would forbid an abandonment of the ship or a refusal to perform the services necessary for her preservation; for, if such conduct were lawful, the parties could not be made responsible for any want of humanity in the exercise of their ordinary rights. From the very necessity of the case, therefore, the law must interpose, and put such a construction on the express stipulations of the parties, as common reason, and justice, and humanity dictate, and supply, from natural equity, such engagements, as the parties have indiscreetly omitted to state. What, indeed, upon the doctrine of the respondent's counsel, are to become of prizes captured after the stipulated period, if the ships be then at sea? Are they to be condemned to the government, as having been made by non-commissioned vessels? If there be no legal connexion between the officers and crew and the privateer, they could not be condemned to the captors, for the commission has no legal existence, when this connexion is completely dissolved. In short, there is no end to the difficulties and inconveniencies of this interpretation. In the absence of all contrary stipulations, it is, in my judgment, in the highest degree reasonable to hold, that a contract for a "cruise" legally terminates in the country, to which the privateer belongs, and from which she derives her commission; and that, if a limitation of time be engrafted on the contract, it shall operate merely to ascertain and limit the time, which may be employed in actual cruising, and after that period require an immediate return to the port or country of origin, the forum domicilii navis, by the most convenient and direct route, without any deviation for the purpose of making captures. Every argument of public policy, and commercial convenience, and private interest, supports and fortifies this doctrine; and it coincides with the legislative policy, which has uniformly manifested itself in an extreme solicitude, as well in peace as in war, to recall our seamen to their native country. So strongly indeed do I think this construction to be founded in the real intention of the parties, that if the contract were expressly in terms "for a cruise of three months," without any reference to place, I should hold it but a compendious and imperfect declaration of their object, and establish upon it

the same commentary, which I have already ventured to avow and vindicate.

I have not, therefore, any hesitation in applying this construction to the articles now before the court. I consider, that the parties have, in effect, stipulated, that the privateer might cruise three successive months from the time of sailing. After that period, it was no longer in the power of the commander or owners to prolong the voyage for the purpose of making captures; and wherever the privateer might then be, she would be bound to return to the United States; and any deviation on the homeward passage, for the purpose of cruising, would be a violation of the articles, entitling the injured parties to redress in damages. And all captures made in such homeward voyage would still be captures "during the cruise," and distributable according to the regulations of the articles. Nor does the clause in the articles, giving the owners an option to determine the cruise at an earlier period, impugn or shake this interpretation. That clause did not, and could not, in the nature of things, be supposed to authorize the owners to break up the cruise, when and where they should please to exercise an arbitrary discretion. It would be utterly unreasonable to suppose, that they might break it up upon the mid ocean, or on some uninhabited coast, and thereby expose the officers and crew to the most serious perils and oppressions. The clause was inserted with a very different aspect, to meet a practical difficulty, which often attended expeditions of this nature. It not unfrequently happened, that shortly after sailing upon the cruise, from the perils of the seas or the presence of a superior hostile force, privateers were compelled to enter some friendly port, or to return to their port of departure. Under these circumstances, it had become a subject of controversy, (though I presume not of any serious legal doubt,) whether the cruise was ended; and, as the seamen usually disposed of a large share of their interests in the proceeds of the cruise, there was a strong temptation to avail themselves of the supposed uncertainty of the law. This was the real origin of stipulations of this nature, which had latterly, in some shape or other, been incorporated into most of the common shipping articles. The reasonable construction of the clause is, that if the privateer should return into a port of the United States within the three months, the owners might, upon a full knowledge of all the facts, have an option to continue the cruise or not. And, therefore, whatever may be the rule as to other acts, this was necessarily a personal authority or confidence reposed in the owners at home, and could not be exercised by themselves, and much less delegated to any agent, to be exercised, at his discretion, in any foreign country.

Upon the interpretation of the shipping articles, which we have now been consider-

ing, the cruise did not determine at Quimper, on the first day of February, although the time for cruising did; but the cruise had a legal existence until the return of the privateer to the United States. I have not, in the preceding view of the case, thought it necessary to consider, what was the peculiar situation of the privateer at Quimper, at the end of the three months, because, if the respondents' counsel were right in their reasoning, it became wholly immaterial, where she might happen to be; and, if they were wrong, it could only be upon principles, which would stand unaffected by such considerations.

In the remaining inquiry, the transactions at Quimper assume a very different aspect. It is argued, that the original cruise was, at that place, put an end to by the consent of all the parties in interest, and a new cruise substituted in its stead, and that the prizes made during this latter cruise, can with no propriety be referred back to the original articles. The engagement of parties to serve on board a private ship of war for a cruise, in consideration of a certain share of the prize money, constitutes a sort of partnership pro hac vice. Abb. Shipp. pt. 4, c. 1, p. 461; 2 Valin, Comm. arts. 32, 33, pp. 359, 392, &c. If the cruise be limited in time, the partnership cannot be dissolved during the term, unless by the consent of all the parties, for whose benefit the clause is inserted, or to whom, from the nature of the covenant, an implied or express authority for this purpose is reserved. In these respects, the same rule is applied, as in cases of ordinary partnerships. Wats. Partn. 381. There is no pretence, that the owners, in the present case, directly consented to the breaking up of the original cruise in France. It is very clear, that the commander had no express authority from the owners to form a second cruise. He declares, that he had authority to break up the first cruise in France, and convert the privateer into a letter of marque, and to return with a cargo to the United States, if he should deem it expedient. But in point of fact, he never acted under this authority; and the second cruise was substituted for the first under a supposed necessity resulting from a mistake of the legal rights of the parties. Was there then an implied authority resulting from the nature of the office of a commander, to break up the cruise, whenever in his discretion he should deem it expedient? We may put out of view all consideration of cases of extreme necessity, where, by analogy to other well known expectations, such an authority ought to be presumed (Hayman v. Molton, 5 Esp. 65; The Gratitudine, 3 C. Rob. Adm. 240; Reid v. Darby, 10 East, 143); for here no such necessity existed. Upon principle, it does not strike me, that any such general authority, as is contended for, can be supported by implication. The commander is appointed for a single cruise, and must be deemed to

have all the powers necessary and proper to accomplish the purposes of that cruise. But a power to break up a cruise can never be implied from a power to perform it; nor a power to institute a new cruise from an appointment to superintend and direct the operations of an existing cruise. There is a case put by Bynkershoek (Q. J. P., Dupon. Ed., c. 18, p. 141) which completely establishes a similar doctrine. The question was, whether the commander of a privateer had an implied authority, during the cruise, to enter into engagements with other cruisers to cruise and make captures on joint account. And this great civilian holds, that no such authority could be implied from the nature of the office, or of the service. That was a stronger case in favor of the commander, than the present; and yet the opinion of Bynkershoek seems founded in solid reasons; for the act of the master was, in effect, the establishment of a new partnership and of new interests in the cruise. Nor is any public policy promoted by establishing such an implied authority. It would offer temptations to unnecessary hazards and new enterprises, beyond the control and superintendence of the owners; and make it for the interest of seamen, who had parted with their shares, to create impediments in the voyage, and indirectly compel the commander to engage in new stipulations for new adventures. If indeed the commander have such an implied authority to engage in a new cruise, he must have a like authority to purchase new outfits and to vary the whole stipulations of the contract, and the division of the prize money; and thereby may involve the owners in great risks and expenses, without securing to them any adequate remuneration. In every view, in which this subject can be contemplated, there seem strong reasons for rejecting the doctrine, which would raise so broad a superstructure of implied powers upon so narrow a foundation. I remain of the opinion, that the stipulations for a second cruise, being unauthorized by the owners, were originally invalid; and if they have been subsequently ratified, this ought not to affect third persons, whom they did not in the first instance bind.

In the case at bar, some of the libellants were separated from the ship, and put on board of prizes, to navigate them into port. This was a most meritorious service for the common benefit; and they are entitled to share in all prizes subsequently made during the cruise, in the same manner, as if they had remained on board; and it was not competent for the other parties, by any acts or agreements, to devest this original right. In respect to these persons, therefore, the breaking up of the cruise at Quimper (supposing it good as to all other parties) was not a binding act. They might still claim their shares of all prizes subsequently made, until the original cruise was legally determined

by the return of the privateer to the United States; for, in a prize court, it can never be permitted to set up a tortious proceeding as a protection against vested rights. And, in asserting this rule, I do nothing more, than follow up a principle long since established in the highest prize tribunal of this country. Keane v. The Gloucester, 2 Dall. [2 U. S.] 36.

The remaining question is, whether the same doctrine can be applied, as between the assignors and assignees. There is no doubt, that, by the assignment, a legal interest passed in all prizes captured during the cruise, which should be condemned to the captors. Morrough v. Comyns, 1 Wils. 211. But the point of difficulty is whether the act. of putting an end to the cruise at Quimper is to be deemed utterly void, so as to bring the subsequent captures within the language of the assignment; or whether the parties are to be left to a common law remedy for damages on account of this unlawful deviation from the contract. The argument on one side is, that the assignees are not to be prejudiced by the tortious acts of their assignors in breaking up the cruise; and on the other side, that as the cruise was broken up, by right or by wrong, the assignees cannot claim any share of the prizes subsequently captured, for they were not captured "during the cruise," on which the privateer was originally bound. The assignees must be presumed to have had full knowledge of the. original shipping articles, and consequently of the nature and extent of the cruise. They were put upon the inquiry by the very terms of the assignments, and if they waived the inquiry, they must now be bound by all the qualifications and conditions originally interposed by the parties. Nothing, therefore, can be drawn in aid of their pretensions from this source; and the attempt of the counsel for this purpose must utterly fail.

It is a sound principle of natural justice, as well as law, that no man shall take advantage of his own wrong. This maxim will be found in the codes of all civilized nations; though the manner in which it is applied for the purposes of justice, must depend upon the municipal regulations and remedies of each particular country, and the courts, in which the same are enforced and administered. A court of admiralty is not bound by the narrow and technical distinctions of common law proceedings. It has an enlarged and liberal discretion, and may decree ex aequo et bono, upon principles of equity and good conscience. It will, therefore, sometimes consider that as done, which ought to have been done, not by decreeing a specific performance, but by placing the parties in the same situation, as if there had been such performance. Thus, if a mariner be wrongfully dismissed from service during the voyage, wages will be decreed in the same manner, as if he had served to its successful conclusion. It may, in like manner,

convert a wrong-doer into a trustee for the benefit of the rightful owner, as even a court of common law sometimes does by a waiver of the tort. If it may decree thus, sitting as an instance court, a fortiori, it may apply the most large and liberal equity, when sitting as a court of prize, and emphatically administering the law of nations and the general principles of civil justice. It is peculiarly fit, under such circumstances, that it should entertain the rule, that the wrong-doer shall not profit by his own unauthorised act; and give the fruits to those, who, if they have not labored in the field, are in equity entitled to the harvest. I am, therefore, prepared to assert, that the assignees ought, upon principles of public policy, to be let in to share in the prize proceeds now in the custody of the court. The prizes were captured, while the privateer was sailing under the commission, by virtue of which the original cruise was undertaken, and condemnation to the captors sought and obtained; and that cruise was not, in point of law, extinguished.

On the whole, I affirm the decree of the district court; but I shall order the whole costs and expenses on each side to be a charge on the prize proceeds. It was impossible to settle the account of any of the parties, until this question was decided.