## ELIZA BOWEN, Administratrix, &c. *versus* The HOPE INSURANCE COMPANY.

## SAME *versus* The MERCHANTS INSURANCE COM PANY.

Where a vessel insured quits her moorings in complete readiness for sea, and it is the actual intention of the master to proceed on the voyage and she is afterwards stopped by head winds and comes to anchor, still intending to proceed as soon as wind and weather will permit, this is a sailing on the voyage within the meaning of the policy.

Thus, a vessel was insured for a year, and if " *at sea* " when the year expired, then the risk was to continue until her arrival in port. Before the expiration of the year, the vessel being at Bangor, in Wales, on the easterly side of the straits of Menai, ready for sea, dropped down seven or eight miles below Bangor, with the intention of proceeding on her voyage to Boston, but in consequence of head winds, came to anchor and was unable to get out of the straits, although she attempted to do so for several successive days, until after the expiration of the year. It was *held* that she was *at sea* at the termination of the year, within the meaning of the policy.

So the same vessel was *held* to be " *on a passage*," under these circumstances, within the meaning of a policy providing that the risk should continue, if the vessel should be " *on a passage* " at the expiration of the year for which she was insured.

IT was agreed by the parties, that these two actions should be decided by the Court, upon the following statement of facts.

The actions were on two policies of insurance effected by a part owner of the brig Governor Brooks. By the first policy, which was dated October 15, 1834, the plaintiff's intestate was insured at the office of the Hope Insurance Company, to the amount of $5000 on the brig, at and from Boston to and at all ports and places to which she might proceed, for one year from the sixth day of October 1834, at noon ; and if the vessel should be *at sea* when the year expired, then the risk was to continue until her arrival at her port of destination and

discharge, at a *pro ratâ* premium.   The other policy, which was underwritten by the Merchants Insurance Company, was similar, except that instead of the words " at sea," the words " on a passage " were used.

The only questions made were, whether, in the one case, the vessel was " at sea," and in the other, whether she was " on a passage," at the termination of the year.

It appeared on the trial, that on June 22, 1835, the vessel sailed from New York on a voyage to Rotterdam, from which place she was to proceed to Bangor in Wales, for a cargo of slates, and thence to Boston ; that Bangor is on the easterly side of the straits of Menai, which lie between Wales and the island of Anglesea ; that on September 25, 1835, the vessel being at Bangor with her cargo of slates on board and all ready for sea, weighed anchor, with the intention of proceeding on her voyage to Boston, and dropped down several miles below Bangor, but not being able to get out of the straits on account of head winds, came to anchor ; that on several successive days, the vessel made sail for the purpose of getting out of the straits and proceeding on her voyage, but did not succeed until the 8th of October, when the pilot left her outside the eastern mouth of the straits ; that she afterwards sustained damage by the perils of the seas, and was obliged to put into Cowes for repairs, in consequence of which divers expenses were incurred, which the plaintiffs sought to recover in this action.

The only question submitted to the jury, under the direction of the Court, was, whether the vessel was in a harbor on the 6th of October 1 - 35, at noon.

The plaintiffs introduced the deposition of Abbott, the master of the vessel, who testified, that after the vessel sailed from Bangor on the 25th of September, he brought up at the eastern mouth of the straits, in consequence of the winds being contrary and the weather unsettled ; that the place where the vessel anchored was generally used for that purpose by outward-bound vessels detained by contrary winds ; and that it was not a harbor, and had no accommodations for receiving or discharging cargoes, but lay open to the Irish sea from the eastward.

The plaintiff also introduced the deposition of Isaac Hopkins, the mate of the vessel, who testified that the vessel came to in the bay, on account of head winds, about five miles below Beaumaris, where on one side was the island of Anglesea, and on the other, sand-banks and shoals ; and that there was no settlement on that part of the island, except a few farm-houses.

Edward Hammond, who was called as a witness by the defendants, testified, that he had made three voyages to Bangor ; that the harbor extends to the perch, where there is a lighthouse on one side, and a ledge of rocks on the other ; that all customhouse business was done at Beaumaris, which is two or three miles below Bangor ; that Bangor was to Beaumaris as Charlestown is to Boston ; that he did not conceive that there was a harbor of Bangor ; that if a vessel anchored inside the perch, all fees were demanded, even if the vessel did not go to Bangor or to Beaumaris ; that if vessels came from Liverpool and had head winds, they often ran in and anchored, and then went out again ; that in such cases, they paid the harbor dues, which are distinct from the customhouse dues ; that while he was last at Bangor, a British ship came within the straits for ballast and paid harbor dues, although she did not go to Beaumaris or to Bangor ; that vessels in the straits generally lie half a cable's length from Anglesea ; that vessels pass through the straits both ways ; that he had seen British coasters discharge timber at Friars roads, but without taking any thing in ; that the pilot takes vessels from Bangor down ; that the moment a vessel passes inside the perch, the customhouse officer comes on board ; and that when the witness was in the brig Francis, which had excisable goods on board, the customhouse officer did not leave till the pilot did, outside of the perch.

The jury found, that the brig was not in a harbor on the 5th day of October 1835.

The defendants objected to the verdict, as being against the weight of evidence. They also contended, that it did not bear directly on the case, as the brig might nevertheless have been neither at sea, nor on her passage, at that time.

If the Court should be of opinion, that the plaintiff could maintain her actions, the defendants were to be defaulted, and the partial and general average losses were to be made up by an assessor, &c. ; but if the Court should be of opinion, that the plaintiff could not maintain her actions, she was to become nonsuit.

*Parsons* and *Stearns,* for the defendants.

*June* 12th.    *C. G. Loring* and *F. C. Loring,* for the plaintiff, cited *Wood* v. *New England Mar. Ins. Co.* 14 Mass. R. 31 ; *Manly* v. *Union Mar. and Fire Ins. Co.* 9 Mass. R. 85 ; *Taber* v. *Nye,* 12 Pick. 105 ; *Scott* v. *Thompson,* 4 Bos. & Pul. 181 ; *Cruikshank* v. *Janson,* 2 Taunton, 301 ; *Thelluson* v. *Ferguson,* Dougl. 361 and note ; *Lang* v. *Anderson,* 3 Barn. and Cressw. 495 ; *Pettigrew* v. *Pringle,* 3 Barn. & Adol. 523 ; Hughes on Ins. 322.

*June* 25th.    SHAW C. J. delivered the opinion of the Court. The policy in the first of these cases was on time, for one year, and if the vessel should be at sea when the year expired, then the risk was to continue until her arrival in port, at a *pro ratâ* premium. The loss occurred after the expiration of the year, and the question is, whether the risk continued, upon the contingency stated, within the meaning of the policy. The term *at sea* may have different meanings, according to the connexion in which it is used. Here it is used in contradistinction to *arrival in port.* If the vessel has sailed or commenced a voyage from one port to another, she must be considered to be at sea, within the meaning of this clause, from the commencement to the termination of that voyage, although during parts of it she may have sought shelter in a place on the way. Then what is a departure on a voyage, and what an arrival, must be settled by the law and usage as established in reference to cases where the *termini* of the voyage, and not periods of time, determine the commencement and termination of the risk. The law upon this subject seems to be well settled, that when a vessel quits her moorings, in complete readiness for sea, and it is the actual and real intention of the master to proceed on the voyage, and she is afterwards stopped by head winds and comes to anchor, still intending to proceed, as soon as wind and weather will permit, this is ·

sailing on the voyage within the policy.   *Bond* v. *Nutt,*   Bowen
Cowper, 601 ; *Lang* v. *Anderson,* 3 Barn. & Cressw. 495 ;   *v.*
*Pettigrew* v. *Pringle,* 3 Barn. & Adol. 523.        Hope Ins.
                                                          Co.

In an early case in this Commonwealth, it was held, that under a similar clause, a vessel might be deemed " at sea," whilst on a foreign voyage, though at the time the vessel was actually in port, having been captured, carried in and detained. *Wood* v. *New England Mar. Ins. Co.* 14 Mass. R. 31.

In the present case, the Court are all of opinion, that upon the facts proved, the vessel had left her moorings and commenced her voyage, when she left the city of Bangor, where she had taken her cargo, with a full purpose of prosecuting her voyage, and fully prepared for sea, and that she was therefore at sea within the meaning of the policy, on the 6th of October, when the year expired ; and then by force of the clause cited, the policy continued until the loss occurred.

In the other policy, the contingency upon which the risk is to continue at the end of the year, is a little differently expressed, the words being, if the vessel shall then be " on a passage." We think the meaning and legal effect are the same in this as in the other policy. A vessel is on a passage after she has left her port of lading, fully prepared to proceed to her port of destination, and with a real intent to do so, although she comes to anchor again on account of head winds, and the intention of proceeding as soon as wind and weather will permit is not relinquished.

The Court are of opinion, that the plaintiff is entitled to recover in both cases, and that an assessor must be appointed, conformably to the agreement of the parties, to ascertain the amount of loss.