---

Ex parte O'HARE.

(Circuit Court of Appeals, Second Circuit. May 2, 1910.)

No. 241.

1. CRIMINAL LAW (§ 97*)—JURISDICTION—LOCALITY OF OFFENSE—"HAVEN."

Waters inclosed in whole or in part by a breakwater or other artificial structure to afford a protected anchorage, as well as those so inclosed by natural land, constitute a "haven" within Rev. St. §§ 5346, 5361, 5362 (U. S. Comp. St. 1901, pp. 3630, 3640), making certain acts offenses against the United States when committed "upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin or bay within the ad-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

miralty jurisdiction of the United States and out of the jurisdiction of any particular state."

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 183, 184; Dec. Dig. § 97.*

For other definitions, see Words and Phrases, vol. 4, p. 3220.]

2. CRIMINAL LAW (§ 97*)—JURISDICTION—LOCALITY OF OFFENSE—"HAVEN."

The waters inclosed between the shore and the government breakwaters in Lake Erie at the port of Buffalo, without as well as within the line designated on the government chart as "Buffalo Harbor Line," constitute a "haven," and not "high seas," within the meaning of Rev. St. § 5346 (U. S. Comp. St. 1901, p. 3630), and an assault with a dangerous weapon committed on a vessel belonging to the United States or citizens thereof anchored in such waters is within the state, and not the federal, jurisdiction.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 183, 184; Dec. Dig. § 97.*

For other definitions, see Words and Phrases, vol. 4, pp. 3287–3289.]

3. CRIMINAL LAW (§ 97*)—JURISDICTION—OFFENSE COMMITTED ON VESSEL ON A VOYAGE.

A steam vessel which has been towed from her winter berth on one of the Great Lakes to an anchorage to be fitted out for the season, but which has not signed a crew nor had a fire built under her boilers, is not "on a voyage," so that jurisdiction of an offense committed thereon is given to the courts of the United States by Act Sept. 4, 1890, c. 874, 26 Stat. 424 (U. S. Comp. St. 1901, p. 3627).

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 183, 184; Dec. Dig. § 97.*]

Coxe, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of New York.

Proceeding by John O'Hare for a writ of habeas corpus. From an order denying the writ (171 Fed. 290), petitioner appeals. Reversed.

O'Hare was arrested by the United States marshal in the city of Buffalo on a charge of violating sections 5346, 5361, and 5362, Rev. St. (U. S. Comp. St. 1901, pp. 3630, 3640), and the acts and statutes amendatory thereof. He was held by a United States commissioner for the action of the grand jury and committed to the county jail. Writs of habeas corpus and certiorari were issued, and after a hearing thereon were dismissed.

George H. Kennedy, for appellant.
John Lord O'Brian, U. S. Atty., for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. The sections under which petitioner was arrested are as follows:

"Sec. 5346. Every person who upon the high seas or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular state, on board any vessel belonging in whole or in part to the United States, or any citizen thereof, with a dangerous weapon, or with intent to perpetrate any felony, commits an assault on another shall be punished by a fine of not more than three thousand dollars, and by imprisonment at hard labor not more than three years."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Sec. 5361. Every person who, upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin or bay, within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state, by surprise or by open force, maliciously attacks or sets upon any vessel belonging to another, with an intent to unlawfully plunder the same, or to despoil any owner thereof of any moneys, goods, or merchandise laden on board thereof shall be punished by a fine of not more than five thousand dollars, and by imprisonment at hard labor not more than ten years.

"Sec. 5362. Every person who, upon the high seas, or in any other of the places mentioned in the preceding section, with intent to commit any felony, breaks or enters any vessel, or maliciously cuts, spoils, or destroys any cordage, cable, buoys, buoy-rope, head-fast, or other fast fixed to the anchor or moorings belonging to any vessel, shall be punished by a fine of not more than one thousand dollars, and by imprisonment at hard labor not more than five years."

The acts complained of took place on the "John Mitchell," a steel steam vessel of 4,000 tons, belonging in whole or in part to citizens of the United States and registered and enrolled under the laws of the United States. She had been berthed for the winter in the Blackwell Canal, Buffalo, and on May 13, 1909, was towed by a tug to a point about 300 feet inside the old Buffalo breakwater, where she was anchored for the purpose of fitting her out. The alleged assault, etc., took place May 18th.

It will appear from the section quoted that the federal government entertains jurisdiction where the vessel is in a "haven," only when such haven is out of the jurisdiction of any particular state. This restriction "does not apply to vessels on the high seas of the lakes." U. S. v. Rodgers, 150 U. S. 249, 14 Sup. Ct. 109, 37 L. Ed. 1071. The question here presented is whether the "John Mitchell" was upon the high seas of Lake Erie, or in a haven connected therewith. No one disputes the fact that the state of New York has jurisdiction of the locus in quo.

From a point on the shore of the lake nearly opposite the westerly line of the city of Buffalo, there extends for about half a mile in a northerly direction the Stony Point Breakwater. Five hundred and fifty feet beyond it comes the South Breakwater, which runs, also northerly, nearly two miles. Two hundred and fifty feet beyond it comes the Old Breakwater which runs, also northerly, about a mile and a half, and ends opposite Buffalo Light at the entrance of Buffalo creek and the beginning of the Niagara river. These three structures practically constitute a single breakwater with entrances through it at two places to the waters inclosed between it and the shore. This structure is about 3,000 feet from the shore line and half that distance from what is designated on the government chart, published by the War Department in 1906, as the "Buffalo Harbor Line," which last is substantially a 17-foot line; there being deeper water between it and the breakwaters. The body of water thus inclosed is designated on the said chart as the "Outer Harbor" of Buffalo. Manifestly it affords an anchorage and refuge for shipping from westerly and southwesterly storms. The John Mitchell lay near the middle of the Old Breakwater about 300 feet in shore from it. A section from the chart shows the situation in detail:

It is contended that, because the breakwater is an artifical structure, the water which it cuts off from the main body of Lake Erie cannot be considered a "haven" or a "basin" within the meaning of these sections. Sir Matthew Hale's definition of a "haven" is quoted, italicized as follows:

"A place of large receipt and safe riding of ships so situated and secured by the *land circumjacent*, that vessels thereby ride and anchor safely, and are protected by the *adjacent land* from dangerous and violent winds." Hale, De Jure Maris, c. 2, 2.

This definition is quoted verbatim in recent law dictionaries— Stroud, Burrill, Black, and Bouvier. We do not know to what extent, in Hale's time, harbors, havens, and basins had been artificially created. There does not seem to be any reasonable distinction be-

tween original upland and made-land. In the upper bay of New York to-day Governor's Island is being extended by filling in to such an extent as to double its area. When that work is done the entire portion above water will be Governor's Island. Why a harbor or haven may not be so improved by artificial structures as to enlarge its capacity and increase its security without losing its character we do not see. The waters inclosed by the breakwaters and forming a continuation of the interior harbor, southeasterly along the shore to the city line, constitute a "haven" within the ordinary meaning of that word as given in the standard dictionaries. It is difficult to see why the circumstances that the federal government constructed the breakwaters and that unless they are kept in repair they would probably be washed away should change the meaning of the word.

Moreover, the intention of Congress as evidenced in the sections quoted is in harmony with our construction. It was very careful to avoid giving jurisdiction of these particular offenses to the federal courts, when they were committed on waters which are indisputably within the jurisdiction of some one of the states which constitute the United States. U. S. v. Rodgers, 150 U. S. 249, 14 Sup. Ct. 109, 37 L. Ed. 1071, held generally that the waters of the Great Lakes and of the rivers which connected them were to be considered "high seas" in the same sense as oceans are. Of jurisdiction touching the particular offense then before the court, which was committed in the Detroit river near the Canadian shore, it held:

"The statute under consideration (section 5346) provides that every person who, upon the high seas or in any river connecting with them, as we construe its language, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular state, commits on board of any vessel belonging in whole or in part to the United States, or any citizen thereof, an assault on another with a dangerous weapon or with intent to perpetrate a felony, shall be punished, etc. The Detroit river from shore to shore is within the admiralty jurisdiction of the United States and connects with the open waters of the lakes—high seas, as we hold them to be, within the meaning of the statute. From the boundary line, near its center to the Canadian shore it is out of the jurisdiction of the state of Michigan. The case presented is therefore directly within its provisions."

This language would certainly seem to imply that, if the vessel on which the assault was committed had been so close to the Michigan shore as to be within the jurisdiction of that state, a different conclusion would have been reached. The same sections, or the older statutes from which they are taken, were considered in U. S. v. Morin, 26 Fed. Cas. 1310; Wynne v. U. S. (April 4, 1910) 30 Sup. Ct. 447, 54 L. Ed. ——.

The government further relies on Act Sept. 4, 1890, c. 874, 26 Stat. 424 (U. S. Comp. St. 1901, p. 3627), which provides that the Circuit and District Courts shall have jurisdiction of such offenses as are specified in the sections above quoted, when committed by any person on a registered or enrolled vessel "being on a voyage upon any of the waters of the Great Lakes * * * or any of the waters connecting any of the said lakes." The evidence, however, shows that the "John Mitchell" was not at the time "on a voyage." She had been towed to anchorage to be fitted out. No fire had been kindled under her boilers. She was not equipped, and had not been equipped that sea-

son, with a crew. Her full crew numbered 21 men. Only 10 had been engaged at any time that season. None of them had yet signed papers for any trip, and her clearance papers were not issued until nearly a week after the occurrences. Under these circumstances, it cannot be held, under the authorities, that the "John Mitchell" on May 18th was on a voyage. See Brown v. Jones, 2 Gall. 477, Fed. Cas. No. 2,017; The Brutus, 2 Gall. 526, Fed. Cas. No. 2,060; The John L. Dimmick, 3 Ware, 196, Fed. Cas. No. 7,355; Bowen v. Hope Ins. Co., 37 Mass. 275, 32 Am. Dec. 213; Burgess v. Equitable Marine Ins. Co., 126 Mass. 70, 30 Am. Rep. 654.

The order is reversed, and cause remanded, with instructions to discharge petitioner.

COXE, Circuit Judge (dissenting). The petitioner is charged with violating a law of the United States which provides, in substance, that· every person who, on board a vessel belonging to citizens of the United States, upon the high seas, or in any river, haven, creek, basin or bay, within the admiralty jurisdiction of the United States and out of the jurisdiction of any particular state, commits an assault, or maliciously assaults, with intent to plunder, shall be punished as therein provided.

The assault in question was made on board the steamer John Mitchell when she was lying 300 feet from the land side of the breakwater built at the eastern end of Lake Erie, and about half a mile from the shore. The situation can be better appreciated by an examination of the following diagram than by many words of description:

In United States v. Rodgers, 150 U. S. 249, 14 Sup. Ct. 109, 37 L. Ed. 1071, the Supreme Court, following the inevitable deduction from the reasoning of The Genesee Chief, 12 How. 443, 13 L. Ed. 1058, decided that the Great Lakes were high seas within the meaning of the statutes here in question and that the courts of the United States have jurisdiction to try the offenses described therein. The sole question, therefore, is whether the erection by the government of a breakwater which may be used, and is used, as an anchorage ground for vessels unable, because of congestion or other reason, to enter the harbor and also for vessels delayed in beginning their westward voyages, converts this portion of the lake into a "haven" within the jurisdiction of the courts of the state of New York?

It is conceded on all sides, that the point where the Mitchell was anchored was "upon the high seas" but for the wall 300 feet west of that point. So the question may be stated thus: Does the erection of a stone breakwater half a mile from the shore, neither end being connected with the land, convert that portion of the high seas lying between it and the shore into a "haven"? To my mind the answer should be in the negative. The Mitchell was anchored inside the wall known as the "Old Breakwater" and it is true that two other sections of wall known as the "South Breakwater" and "Stony Point" Breakwater," the latter being connected with the shore, run south from the "Old Breakwater" on a line substantially parallel with it. Between these sections there are wide sea openings said to be 500 and 250 feet respectively. If it be contended that the three walls in question are to be considered as one continuous wall, it follows that a section of Lake Erie four miles long and half a mile wide has been converted into a haven and removed from the jurisdiction of the United States courts.

But, however this may be, it remains true that the existence of the "Old Breakwater" is necessary to give any plausibility to the argument of the petitioner. If that did not exist, the assault would have occurred on a vessel anchored in the waters of Lake Erie. The same is true if the Mitchell had been anchored 300 feet west of the breakwater. Should a storm destroy the wall or the government decide to discontinue it, the jurisdiction of the federal courts might be restored in a single night to the venue of the assault. The unwisdom of vesting the jurisdiction of the United States courts upon circumstances so factitious seems to me obvious.

The word "haven" as used in the statute does not mean the quiet waters under the lee of a wall which man has erected to protect the land from the inroads of the sea, but refers to those places of safety between fauces terræ which nature has protected from the elements and where ships may ride in safety. The latter construction creates a jurisdiction as immutable as the laws of nature; the one contended for by the petitioner must constantly change with the improvements made by man. A breakwater built to protect a city from the tides or prevent a harbor from being inundated may destroy a jurisdiction which existed before the Union was formed. It is true that in one sense the issue is not important, as it relates to what may be considered a simple assault and battery, but in its consequences it is far reaching.

The trend of decision in the federal courts has been steadily in favor of widening the jurisdiction in admiralty; if we uphold the petitioner's contention, it will, in my judgment, be a distinct step backwards. The facts in the present case illustrate how easy it will be to hamper the commerce of the Great Lakes by lawless acts if large sections of the high seas are to be removed from the jurisdiction of the national courts. If the doctrine contended for be universally adopted, it follows that not only on the Great Lakes, but on the ocean as well, the section, where ships may anchor between a protecting wall and the shore must be withdrawn from the jurisdiction of the federal courts, with the constant clashing of authority which is sure to follow.

The commerce of the Great Lakes is not only national, but international, in character and should be under the jurisdiction and protection of the national courts.

The decision of the District Court should be affirmed.