# UNITED STATES *v.* RODGERS.

## CERTIFICATE OF DIVISION IN OPINION FROM THE EASTERN DISTRICT OF MICHIGAN.

No. 30. Submitted April 21, 1893. — Decided November 20, 1893.

The term "high seas," as used in the provision in Rev. Stat., § 5346, that "every person who, upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular State, on board any vessel belonging in whole or part to the United States, or any citizen thereof, with a dangerous weapon, or with intent to perpetrate any felony, commits an assault upon another shall be punished," etc., is applicable to the open, unenclosed waters of the Great Lakes, between which the Detroit River is a connecting stream.

The courts of the United States have jurisdiction, under that section of the Revised Statutes, to try a person for an assault with a dangerous weapon, committed on a vessel belonging to a citizen of the United States, when such vessel is in the Detroit River, out of the jurisdiction of any particular State, and within the territorial limits of the Dominion of Canada.

The limitation of jurisdiction by the qualification that the offences punishable are committed on vessels in any arm of the sea, or in any river, haven, creek, basin, or bay "without the jurisdiction of any particular State," which means without the jurisdiction of any State of the Union, does not apply to vessels on the "high seas" of the lakes, but only to vessels on the waters designated as connecting with them; and so far as vessels on those seas are concerned, there is no limitation named to the authority of the United States.

IN February, 1888, the defendant, Robert S. Rodgers and others, were indicted in the District Court of the United States

for the Eastern District of Michigan for assaulting, in August, 1887, with a dangerous weapon, one James Downs, on board of the steamer Alaska, a vessel belonging to citizens of the United States, and then being within the admiralty jurisdiction of the United States, and not within the jurisdiction of any particular State of the United States, viz. within the territorial limits of the Dominion of Canada.

The indictment contained six counts, charging the offence to have been committed in different ways, or with different intent, and was remitted to the Circuit Court for the Sixth Circuit of the Eastern District of Michigan. There the defendant Rodgers filed a plea to the jurisdiction of the court, alleging that it had no jurisdiction of the matters charged, as appeared on the face of the indictment, and to the plea a demurrer was filed. Upon this demurrer the judges of the Circuit Court were divided in opinion, and they transmitted to this court the following certificate of division:

## " Certificate of Division of Opinion.

" United States of America. The Circuit Court of the United States for the Sixth Circuit and Eastern District of Michigan.

" The United Sates
     vs.
Robert S. Rodgers.

" The defendant in this cause was indicted on the twenty-fourth day of February, in the year of our Lord one thousand eight hundred and eighty-eight, in the District Court of the United States for the Eastern District of Michigan, together with John Gustave Beyers and others, charged, under section 5346 of the Revised Statutes of the United States, with having made an assault with dangerous weapons upon one James Downs, the assault having taken place on the steamer Alaska, a vessel owned by citizens of the United States, while such vessel was in the Detroit River, out of the jurisdiction of any particular State of the United States and within the territorial limits of the Dominion of Canada, and the said Robert S. Rodgers, and the others indicted with him, having first, after

the assault, come into the United States in the Eastern District of Michigan.

"On the twentieth day of September, in the year of our Lord one thousand eight hundred and eighty-nine, the defendant Rodgers was arrested, and on the same day the indictment was, on motion of the United States attorney for the Eastern District of Michigan, and by order of the District Court for such district, remitted to the Circuit Court for such district, and, with all proceedings theretofore taken, certified to such Circuit Court.

"On the twenty-third day of September, in the year of our Lord one thousand eight hundred and eighty-nine, the defendant, on being called upon to plead in the Circuit Court of the United States for the Eastern District of Michigan, by permission of the court pleaded in abatement to the jurisdiction of the court, claiming that under section 5346 of the Revised Statutes of the United States the courts of the United States have no jurisdiction of offences committed in the Detroit River on a vessel of the United States within the territorial limits of the Dominion of Canada.

"The United States, by C. P. Black, United States attorney, and Charles T. Wilkins, assistant United States attorney for the Eastern District of Michigan, demurred to such plea, and the defendant joined on demurrer.

"The matter of the plea of the jurisdiction coming on to be heard in the Circuit Court of the United States for the Eastern District of Michigan, on the third day of October, in the year of our Lord one thousand eight hundred and eighty-nine, before the circuit and district judges, and the defendant being present in court, the said circuit and district judges were divided in opinion on the question: '*Whether the courts of the United States have jurisdiction, under section 5346 of the Revised Statutes of the United States, to try a person for an assault, with a dangerous weapon, committed on a vessel belonging to a citizen of the United States, when such vessel is in the Detroit River, out of the jurisdiction of any particular State and within the territorial limits of the Dominion of Canada.*'

"And so, at the request of the defendant and of the United

States attorney for this district, the circuit and district judges do hereby at the same term state this point upon which they disagree, and hereby direct the same to be certified under the seal of the Circuit Court of the United States for the Eastern District of Michigan to the Supreme Court of the United States at its next session, for its opinion thereon.

"HOWELL E. JACKSON, *Circuit Judge.*

"HENRY B. BROWN, *District Judge.*"

Section 5346 of the Revised Statutes, upon which the indictment was found, is as follows :

"SEC. 5346. Every person who, upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular State, on board any vessel belonging in whole or part to the United States, or any citizen thereof, with a dangerous weapon, or with intent to perpetrate any felony, commits an assault on another shall be punished by a fine of not more than three thousand dollars and by imprisonment at hard labor not more than three years."

The statute relating to the place of trial in this case is contained in section 730 of the Revised Statutes, which is as follows :

"SEC. 730. The trial of all offences committed upon the high seas or elsewhere, out of the jurisdiction of any particular State or district, shall be in the district, where the offender is found or into which he is first brought."

*Mr. Assistant Attorney General Parker* for the United States.

No appearance for Rodgers.

MR. JUSTICE FIELD delivered the opinion of the court.

Several questions of interest arise upon the construction of section 5346 of the Revised Statutes, upon which the indict-

ment in this case was found. The principal one is whether the term "high seas," as there used, is applicable to the open, unenclosed waters of the Great Lakes, between which the Detroit River is a connecting stream. The term was formerly used, particularly by writers on public law, and generally in official communications between different governments, to designate the open, unenclosed waters of the ocean, or of the British seas, outside of their ports and havens. At one time it was claimed that the ocean, or portions of it, were subject to the exclusive use of particular nations. The Spaniards, in the 16th century, asserted the right to exclude all others from the Pacific Ocean. The Portuguese claimed, with the Spaniards, under the grant of Pope Alexander VI., the exclusive use of the Atlantic Ocean west and south of a designated line. And the English, in the 17th century, claimed the exclusive right to navigate the seas surrounding Great Britain. Woolsey on International Law, § 55.

In the discussions which took place in support of and against these extravagant pretensions the term "high seas" was applied, in the sense stated. It was also used in that sense by English courts and law writers. There was no discussion with them as to the waters of other seas. The public discussions were generally limited to the consideration of the question whether the high seas, that is, the open, unenclosed seas, as above defined, or any portion thereof, could be the property or under the exclusive jurisdiction of any nation, or whether they were open and free to the navigation of all nations. The inquiry in the English courts was generally limited to the question whether the jurisdiction of the admiralty extended to the waters of bays and harbors, such extension depending upon the fact whether they constituted a part of the high seas.

In his treatise on the rights of the sea, Sir Matthew Hale says: "The sea is either that which lies within the body of a county, or without. That arm or branch of the sea which lies within the *fauces terræ*, where a man may reasonably discern between shore and shore, is, or at least may be, within the body of a county, and, therefore, within the jurisdiction of the

sheriff or coroner. That part of the sea which lies not within the body of a county is called the main sea or ocean." De Jure Maris, c. iv. By the "main sea." Hale here means the same thing expressed by the term "high sea" — "*mare altum*," or "*le haut meer*."

In *Waring* v. *Clarke*, 5 How. 440, 453, this court said that it had been frequently adjudicated in the English common law courts since the restraining statutes of Richard II. and Henry IV., "that high seas mean that portion of the sea which washes the open coast." In *United States* v. *Grush*, 5 Mason, 290, it was held by Mr. Justice Story, in the United States Circuit Court, that the term "high seas," in its usual sense, expresses the unenclosed ocean or that portion of the sea which is without the *fauces terræ* on the sea coast, in contradistinction to that which is surrounded or enclosed between narrow headlands or promontories. It was the open, unenclosed waters of the ocean, or the open, unenclosed waters of the sea, which constituted the "high seas" in his judgment. There was no distinction made by him between the ocean and the sea, and there was no occasion for any such distinction. The question in issue was whether the alleged offences were committed within a county of Massachusetts on the sea coast, or without it, for in the latter case they were committed upon the high seas and within the statute. It was held that they were committed in the county of Suffolk, and thus were not covered by the statute.

If there were no seas other than the ocean, the term "high seas" would be limited to the open, unenclosed waters of the ocean. But as there are other seas besides the ocean, there must be high seas other than those of the ocean. A large commerce is conducted on seas other than the ocean and the English seas, and it is equally necessary to distinguish between their open waters and their ports and havens, and to provide for offences on vessels navigating those waters and for collisions between them. The term "high seas" does not, in either case, indicate any separate and distinct body of water; but only the open waters of the sea or ocean, as distinguished from ports and havens and waters within narrow headlands

on the coast.   This distinction was observed by Latin writers between the ports and havens of the Mediterranean and its open waters — the latter being termed the high seas.[1]   In that sense the term may also be properly used in reference to the open waters of the Baltic and the Black Sea, both of which are inland seas, finding their way to the ocean by a narrow and distant channel.   Indeed, wherever there are seas in fact, free to the navigation of all nations and people on their borders, their open waters outside of the portion " surrounded or enclosed between narrow headlands or promontories," on the coast, as stated by Mr. Justice Story, or " without the body of a county," as declared by Sir Matthew Hale, are properly characterized as high seas, by whatever name the bodies of water of which they are a part may be designated.   Their names do not determine their character.   There are, as said above, high seas on the Mediterranean, (meaning outside of the enclosed waters along its coast,) upon which the principal commerce of the ancient world was conducted and its great naval battles fought.   To hold that on such seas there are no high seas, within the true meaning of that term, that is, no open, unenclosed waters, free to the navigation of all nations and people on their borders, would be to place upon that term a narrow and contracted meaning. We prefer to use it in its true sense, as applicable to the open, unenclosed waters of all seas, than to adhere to the common meaning of the term two centuries ago, when it was generally limited to the open waters of the ocean and of seas surrounding Great Britain, the freedom of which was then the principal subject of discussion.   If it be conceded, as we think it must be, that the open, unenclosed waters of the Mediterranean are high seas, that concession is a sufficient answer to the claim that the high seas always denote the open waters of the ocean.

Whether the term is applied to the open waters of the

---

[1] " Insula *portum*
Efficit objectu laterum, quibus omnis ab *alto*
Frangitur, inque sinus scindit sese unda reductos."
— *The Æneid. Lib.* 1, v. 159–161.

ocean or of a particular sea, in any case, will depend upon the context or circumstances attending its use, which in all cases affect, more or less, the meaning of language. It may be conceded that if a statement is made that a vessel is on the high seas, without any qualification by language or circumstance, it will be generally understood as meaning that the vessel is upon the open waters of one of the oceans of the world. It is true, also, that the ocean is often spoken of by writers on public law as *the sea*, and characteristics are then ascribed to the sea generally which are properly applicable to the ocean alone; as, for instance, that its open waters are, the highway of all nations. Still the fact remains that there are other seas than the ocean whose open waters constitute a free highway for navigation to the nations and people residing on their borders, and are not a free highway to other nations and people, except there be free access to those seas by open waters or by conventional arrangements.

As thus defined, the term would seem to be as applicable to the open waters of the great Northern lakes as it is to the open waters of those bodies usually designated as seas. The Great Lakes possess every essential characteristic of seas. They are of large extent in length and breadth; they are navigable the whole distance in either direction by the largest vessels known to commerce; objects are not distinguishable from the opposite shores; they separate, in many instances, States, and in some instances constitute the boundary between independent nations; and their waters, after passing long distances, debouch into the ocean. The fact that their waters are fresh and not subject to the tides, does not affect their essential character as seas. Many seas are tideless, and the waters of some are saline only in a very slight degree.

The waters of Lake Superior, the most northern of these lakes, after traversing nearly 400 miles, with an average breadth of over 100 miles, and those of Lake Michigan, which extend over 350 miles, with an average breadth of 65 miles, join Lake Huron, and, after flowing about 250 miles, with an average breadth of 70 miles, pass into the river St. Clair; thence through the small lake of St. Clair into the Detroit

River; thence into Lake Erie and, by the Niagara River, into Lake Ontario; whence they pass, by the river St. Lawrence, to the ocean, making a total distance of over 2000 miles. Ency. Britannica, vol. 21, p. 178. The area of the Great Lakes, in round numbers, is 100,000 square miles. Ibid. vol. 14, p. 217. They are of larger dimensions than many inland seas which are at an equal or greater distance from the ocean. The waters of the Black Sea travel a like distance before they come into contact with the ocean. Their first outlet is through the Bosphorus, which is about 20 miles long and for the greater part of its way less than a mile in width, into the sea of Marmora, and through that to the Dardanelles, which is about 40 miles in length and less than four miles in width, and then they find their way through the islands of the Greek Archipelago, up the Mediterranean Sea, past the Straits of Gibraltar to the ocean, a distance, also, of over 2000 miles.

In the *Genesee Chief* case, 12 How. 443, this court, in considering whether the admiralty jurisdiction of the United States extended to the Great Lakes, and speaking, through Chief Justice Taney, of the general character of those lakes, said: "These lakes are, in truth, inland seas. Different States border on them on one side, and a foreign nation on the other. A great and growing commerce is carried on upon them between different States and a foreign nation, which is subject to all the incidents and hazards that attend commerce on the ocean. Hostile fleets have encountered on them, and prizes been made; and every reason which existed for the grant of admiralty jurisdiction to the general government on the Atlantic seas applies with equal force to the lakes. There is an equal necessity for the instance and for the prize power of the admiralty court to administer international law, and if the one cannot be established, neither can the other." (p. 453.)

After using this language, the Chief Justice commented upon the inequality which would exist, in the administration of justice, between the citizens of the States on the lakes, if, on account of the absence of tide water in those lakes, they were not entitled to the remedies afforded by the grant of

admiralty jurisdiction of the Constitution, and the citizens of
the States bordering on the ocean or upon navigable waters
affected by the tides. The court, perceiving that the reason
for the exercise of the jurisdiction did not in fact depend upon
the tidal character of the waters, but upon their practical
navigability for the purposes of commerce, disregarded the test
of tide water prevailing in England as inapplicable to our
country with its vast extent of inland waters. Acting upon
like considerations in the application of the term "high seas"
to the waters of the Great Lakes, which are equally navigable,
for the purposes of commerce, in all respects, with the bodies
of water usually designated as seas, and are in no respect
affected by the tidal or saline character of their waters, we
disregard the distinctions made between salt and fresh water
seas, which are not essential, and hold that the reason of the
statute, in providing for protection against violent assaults on
vessels in tidal waters, is no greater but identical with the
reason for providing against similar assaults on vessels in
navigable waters that are neither tidal nor saline. The statute
was intended to extend protection to persons on vessels be-
longing to citizens of the United States, not only upon the
high seas, but in all navigable waters of every kind out of the
jurisdiction of any particular State, whether moved by the tides
or free from their influence.

The character of these lakes as seas was recognized by this
court in the recent *Chicago Lake Front case*, where we said:
"These lakes possess all the general characteristics of open
seas, except in the freshness of their waters, and in the absence
of the ebb and flow of the tide." "In other respects," we
added, "they are inland seas, and there is no reason or prin-
ciple for the assertion of dominion and sovereignty over and
ownership by the State of lands covered by tide waters that
is not equally applicable to its ownership of and dominion and
sovereignty over lands covered by the fresh waters of these
lakes." *Illinois Central Railroad* v. *Illinois*, 146 U. S. 387,
435.

It is to be observed also that the term "high" in one of its
significations is used to denote that which is common, open,

and public. Thus every road or way or navigable river which is used freely by the public is a " high ". way. So a large body of navigable water other than a river, which is of an extent beyond the measurement of one's unaided vision, and is open and unconfined, and not under the exclusive control of any one nation or people, but is the free highway of adjoining nations or people, must fall under the definition of " high seas " within the meaning of the statute. We may as appropriately designate the open, unenclosed waters of the lakes as the high seas of the lakes, as to designate similar waters of the ocean as the high seas of the ocean, or similar waters of the Mediterranean as the high seas of the Mediterranean.

The language of section 5346, immediately following the term " high seas," declaring the penalty for violent assaults when committed on board of a vessel in any arm of the sea or in any river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular State, equally as when committed on board of a vessel on the high seas, lends force to the construction given to that term. The language used must be read in conjunction with that term, and as referring to navigable waters out of the jurisdiction of any particular State, but connecting with the high seas mentioned. The Detroit River, upon which was the steamer Alaska at the time the assault was committed, connects the waters of Lake Huron (with which, as stated above, the waters of Lake Superior and Lake Michigan join) with the waters of Lake Erie, and separates the Dominion of Canada from the United States, constituting the boundary between them, the dividing line running nearly midway between its banks, as established by commissioners, pursuant to the treaty between the two countries. 8 Stat. 274, 276. The river is about 22 miles in length and from one to three miles in width, and is navigable at all seasons of the year by vessels of the largest size. The number of vessels passing through it each year is immense. Between the years 1880 and 1892, inclusive, they averaged from thirty-one to forty thousand a year, having a tonnage varying from sixteen to twenty-four

millions.[1] In traversing the river they are constantly passing
from the territorial jurisdiction of the one nation to that of
the other. All of them, however, so far as transactions had
on board are concerned, are deemed to be within the country
of their owners. Constructively they constitute a part of the
territory of the nation to which the owners belong. Whilst
they are on the navigable waters of the river they are within
the admiralty jurisdiction of that country. This jurisdiction
is not changed by the fact that each of the neighboring nations
may in some cases assert its own authority over persons on
such vessels in relation to acts committed by them within its
territorial limits. In what cases jurisdiction by each country
will be thus asserted and to what extent, it is not necessary to
inquire, for no question on that point is presented for our con-
sideration. The general rule is that the country to which the
vessel belongs will exercise jurisdiction over all matters affect-
ing the vessel or those belonging to her, without interference
of the local government, unless they involve its peace, dignity,
or tranquillity, in which case it may assert its authority.
*Wildenhus's case*, 120 U. S. 1, 12; Halleck on International
Law, c. vii, § 26, p. 172. The admiralty jurisdiction of the
country of the owners of the steamer upon which the offence
charged was committed is not denied. They being citizens of

---

[1] The following statement, furnished by Colonel O. M. Poe, of the Engi-
neer Corps, shows the traffic through Detroit River for the years indicated:

| Year. | Number of Vessels. | Registered Tonnage. | Year. | Number of Vessels. | Registered Tonnage. |
|---|---|---|---|---|---|
| 1880....... | 40,521 | 20,235,249 | 1886....... | 38,261 | 18,968,065 |
| 1881....... | 35,888 | 17,572,240 | 1887....... | 38,125 | 18,864,250 |
| 1882....... | 35,199 | 17,872,182 | 1888....... | 31,404 | 19,099,060 |
| 1883....... | 40,385 | 17,695,174 | 1889....... | 32,415 | 19,646,000 |
| 1884....... | 38,742 | 18,045,949 | 1890....... | 35,640 | 21,684,000 |
| 1885....... | 34,921 | 16,777,828 | 1891....... | 34,251 | 22,160,000 |
|  |  |  | 1892....... | 33,860 | 24,785,000 |

Colonel Poe adds: "This statement does not include Canadian vessels, a
large number of which use this channel, nor does it include any vessels not
clearing from the various custom houses. Were these included, a consider
ably greater showing could be made. They are not included because the
statistics cannot be obtained."

the United States, and the steamer being upon navigable waters, it is deemed to be within the admiralty jurisdiction of the United States. It was, therefore, perfectly competent for Congress to enact that parties on board committing an assault with a dangerous weapon should be punished when brought within the jurisdiction of the District Court of the United States. But it will hardly be claimed that Congress by the legislation in question intended that violent assaults committed upon persons on vessels owned by citizens of the United States in the Detroit River, without the jurisdiction of any particular State, should be punished, and that similar offences upon persons on vessels of like owners upon the adjoining lakes should be unprovided for. If the law can be deemed applicable to offences committed on vessels in any navigable river, haven, creek, basin, or bay, connecting with the lakes, out of the jurisdiction of any particular State, it would not be reasonable to suppose that Congress intended that no remedy should be afforded for similar offences committed on vessels upon the lakes, to which the vessels on the river, in almost all instances, are directed, and upon whose waters they are to be chiefly engaged. The more reasonable inference is that Congress intended to include the open, unenclosed waters of the lakes under the designation of high seas. The term, in the eye of reason, is applicable to the open, unenclosed portion of all large bodies of navigable waters, whose extent cannot be measured by one's vision, and the navigation of which is free to all nations and people on their borders, by whatever names those bodies may be locally designated. In some countries small lakes are called seas, as in the case of the Sea of Galilee, in Palestine. In other countries large bodies of water, greater than many bodies denominated seas, are called lakes, gulfs, or basins. The nomenclature, however, does not change the real character of either, nor should it affect our construction of terms properly applicable to the waters of either. By giving to the term "high seas" the construction indicated, there is consistency and sense in the whole statute, but there is neither if it be disregarded. If the term applies to the open, unenclosed waters of the lakes, the appli-

cation of the legislation to the case under indictment cannot be questioned, for the Detroit River is a water connecting such high seas, and all that portion which is north of the boundary line between the United States and Canada is without the jurisdiction of any State of the Union. But if they be considered as not thus applying, it is difficult to give any force to the rest of the statute without supposing that Congress intended to provide against violence on board of vessels in navigable rivers, havens, creeks, basins, and bays, without the jurisdiction of any particular State, and intentionally omitted the much more important provision for like violence and disturbances on vessels upon the Great Lakes. All vessels in any navigable river, haven, creek, basin, or bay of the lakes, whether within or without the jurisdiction of any particular State, would some time find their way upon the waters of the lakes; and it is not a reasonable inference that Congress intended that the law should apply to offences only on a limited portion of the route over which the vessels were expected to pass, and that no provision should be made for such offences over a much greater distance on the lakes.

Congress in thus designating the open, unenclosed portion of large bodies of water, extending beyond one's vision, naturally used the same term to indicate it as was used with reference to similar portions of the ocean or of bodies which had been designated as seas. When Congress, in 1790, first used that term the existence of the Great Lakes was known; they had been visited by great numbers of persons in trading with the neighboring Indians, and their immense extent and character were generally understood. Much more accurate was this knowledge when the act of March 3, 1825, was passed, 4 Stat. 115, c. 65, and when the provisions of section 5346 were reënacted in the Revised Statutes in 1874. In all these cases, when Congress provided for the punishment of violence on board of vessels, it must have intended that the provision should extend to vessels on those waters the same as to vessels on seas, technically so called. There were no bodies of water in the United States to any portion of which the term "high seas" was applicable if not to the open,

unenclosed waters of the Great Lakes. It does not seem reasonable to suppose that Congress intended to confine its legislation to the high seas of the ocean, and to its navigable rivers, havens, creeks, basins, and bays, without the jurisdiction of any State, and to make no provision for offences on those vast bodies of inland waters of the United States. There are vessels of every description on those inland seas now carrying on a commerce greater than the commerce on any other inland seas of the world. And we cannot believe that the Congress of the United States purposely left for a century those who navigated and those who were conveyed in vessels upon those seas without any protection.

The statute under consideration provides that every person who, upon the high seas or in any river connecting with them, as we construe its language, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular State, commits, on board of any vessel belonging in whole or in part to the United States, or any citizen thereof, an assault on another with a dangerous weapon or with intent to perpetrate a felony, shall be punished, etc. The Detroit River, from shore to shore, is within the admiralty jurisdiction of the United States, and connects with the open waters of the lakes — high seas, as we hold them to be, within the meaning of the statute. From the boundary line, near its centre, to the Canadian shore it is out of the jurisdiction of the State of Michigan. The case presented is therefore directly within its provisions. The act of Congress of September 4, 1890, 26 Stat. 424, c. 874, (1 Sup. to the Rev. Stat. chap. 874, p. 799,) providing for the punishment of crimes subsequently committed on the Great Lakes, does not, of course, affect the construction of the law previously existing.

We are not unmindful of the fact that it was held by the Supreme Court of Michigan in *People* v. *Tyler*, 7 Michigan, 161, that the criminal jurisdiction of the Federal courts did not extend to offences committed upon vessels on the lakes. The judges who rendered that decision were able and distinguished; but that fact, whilst it justly calls for a careful consideration of their reasoning, does not render their conclu-

sion binding or authoritative upon this court. Their opinions show that they did not accept the doctrine extending the admiralty jurisdiction to cases on the lakes and navigable rivers, which is now generally, we might say almost universally, received as sound by the judicial tribunals of the country. It is true, as there stated, that, as a general principle, the criminal laws of a nation do not operate beyond its territorial limits, and that to give any government, or its judicial tribunals, the right to punish any act or transaction as a crime, it must have occurred within those limits. We accept this doctrine as a general rule, but there are exceptions to it as fully recognized as the doctrine itself. One of those exceptions is that offences committed upon vessels belonging to citizens of the United States, within their admiralty jurisdiction, (that is, within navigable waters,) though out of the territorial limits of the United States, may be judicially considered when the vessel and parties are brought within their territorial jurisdiction. As we have before stated, a vessel is deemed part of the territory of the country to which she belongs. Upon that subject we quote the language of Mr. Webster, while Secretary of State, in his letter to Lord Ashburton of August, 1842. Speaking for the government of the United States, he stated with great clearness and force the doctrine which is now recognized by all countries. He said: "It is natural to consider the vessels of a nation as parts of its territory, though at sea, as the State retains its jurisdiction over them; and, according to the commonly received custom, this jurisdiction is preserved over the vessels even in parts of the sea subject to a foreign dominion. This is the doctrine of the law of nations, clearly laid down by writers of received authority, and entirely conformable, as it is supposed, with the practice of modern nations. If a murder be committed on board of an American vessel by one of the crew upon another or upon a passenger, or by a passenger on one of the crew or another passenger, while such vessel is lying in a port within the jurisdiction of a foreign State or sovereignty, the offence is cognizable and punishable by the proper court of the United States in the same manner as if such offence had

been committed on board the vessel on the high seas.   The law of England is supposed to be the same.   It is true that the jurisdiction of a nation over a vessel belonging to it, while lying in the port of another, is not necessarily wholly exclusive.   We do not so consider or so assert it.   For any unlawful acts done by her while thus lying in port, and for all contracts entered into while there, by her master or owners, she and they must, doubtless, be answerable to the laws of the place. Nor, if her master or crew, while on board in such port, break the peace of the community by the commission of crimes, can exemption be claimed for them.   But, nevertheless, the law of nations, as I have stated it, and the statutes of governments founded on that law, as I have referred to them, show that enlightened nations, in modern times, do clearly hold that the jurisdiction and laws of a nation accompany her ships not only over the high seas, but into ports and harbors, or wheresoever else they may be water-borne, for the general purpose of governing and regulating the rights, duties, and obligations of those on board thereof, and that, to the extent of the exercise of this jurisdiction, they are considered as parts of the territory of the nation herself." 6 Webster's Works, 306, 307.

We do not accept the doctrine that, because by the treaty between the United States and Great Britain the boundary line between the two countries is run through the centre of the lakes, their character as seas is changed, or that the jurisdiction of the United States to regulate vessels belonging to their citizens navigating those waters and to punish offences committed upon such vessels, is in any respect impaired. Whatever effect may be given to the boundary line between the two countries, the jurisdiction of the United States over the vessels of their citizens navigating those waters and the persons on board remains unaffected.   The limitation to the jurisdiction by the qualification that the offences punishable are committed on vessels in any arm of the sea, or in any river, haven, creek, basin, or bay " without the jurisdiction of any particular State," which means without the jurisdiction of any State of the Union, does not apply to vessels on the " high

"seas" of the lakes, but only to vessels on the waters designated as connecting with them. So far as vessels on those seas are concerned, there is no limitation named to the authority of the United States. It is true that lakes, properly so called, that is, bodies of water whose dimensions are capable of measurement by the unaided vision, within the limits of a State, are part of its territory and subject to its jurisdiction, but bodies of water of an extent which cannot be measured by the unaided vision, and which are navigable at all times, in all directions, and border on different nations or States or people, and find their outlet in the ocean as in the present case, are seas in fact, however they may be designated. And seas in fact do not cease to be such, and become lakes, because by local custom they may be so called.

In our judgment the District Court of the Eastern District of Michigan had jurisdiction to try the defendant upon the indictment found, and it having been transferred to the Circuit Court, that court had jurisdiction to proceed with the trial, and the demurrer to its jurisdiction should have been overruled. Our opinion, in answer to the certificate, is that

*The courts of the United States have jurisdiction, under section 5346 of the Revised Statutes, to try a person for an assault, with a dangerous weapon, committed on a vessel belonging to a citizen of the United States, when such vessel is in the Detroit River, out of the jurisdiction of any particular State, and within the territorial limits of the Dominion of Canada; and it will be returned to the Circuit Court of the United States for the Sixth Circuit and Eastern District of Michigan, and it is so ordered.*

MR. JUSTICE GRAY dissenting.

The opinion of the majority of the court is avowedly based upon the hypothesis that the open waters of the Great Lakes are "high seas," within the meaning of section 5346 of the Revised Statutes, on which the indictment in this case is founded.

That hypothesis I am unable to accept. It appears to me

to be inconsistent with the settled meaning of the term "high seas," in our law, and in common speech, and especially as used in the Crimes Acts of the United States, as heretofore uniformly expounded by this court, and by the justices thereof.

According to all the authorities, without exception, "the high seas" denote the ocean, the common highway of all nations — sometimes as including, sometimes as excluding, bays and arms of the sea, or waters next the coast, which are within the dominion and jurisdiction of particular States — but never as extending to any waters not immediately connecting with the sea.

The first Crimes Act of the United States provided, in section 8, for the punishment of murder or other capital offence committed "upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular State;" and, in section 12, for the punishment of any person who should "commit manslaughter upon the high seas," but not mentioning in that section any other waters. Act of April 30, 1790, c. 9; 1 Stat. 113, 115. In *United States* v. *Wiltberger*, decided by this court in 1820, it was adjudged that manslaughter committed by the master upon one of the seamen, on board a merchant vessel of the United States, below low water mark of a river flowing into the sea in China, was not "manslaughter upon the high seas," nor within the act of 1790; and Chief Justice Marshall, in delivering judgment, said: "If the words be taken according to the common understanding of mankind, if they be taken in their popular and received sense, the 'high seas,' if not in all instances confined to the ocean which washes a coast, can never extend to a river about half a mile wide, and in the interior of a country." 5 Wheat. 76, 94.

In *United States* v. *Brailsford*, this court held that the words "out of the jurisdiction of any particular State," in section 8 of the act of 1790, meant a State of the Union, and not a foreign State; and that a ship lying at anchor in an open roadstead, within a marine league of a foreign shore, and not in a river, haven, basin or bay, might be found by a jury to be on the high seas. 5 Wheat. 184, 189, 200. A similar

decision had been previously made by Mr. Justice Story. *United States* v. *Ross*, 1 Gallison, 624.

In *United States* v: *Hamilton*, Mr. Justice Story held that larceny in an enclosed dock, within the ebb and flow of the tide, in a foreign port, was not larceny "upon the high seas," under section 16 of the act of 1790. 1 Mason, 152. In *United States* v. *Morel*, it was held by Mr. Justice Baldwin and Judge Hopkinson, that an indictment on the same section was not sustained by proof of stealing in a land-locked harbor of one of the Bahama Islands; the court saying: "The open sea, the high sea, the ocean, is that which is the common highway of nations, the common domain within the body of no country, and under the particular right or jurisdiction of no sovereign, but open, free and common to all alike, as a common and equal right." 13 American Jurist, 279, 282. And in *United States* v. *Jackson*, a like decision was made by Mr. Justice Thompson and Judge Betts as to larceny in the harbor of Vera Cruz, because "the high seas were, properly speaking, within the territory of no State or country." 2 N. Y. Leg. Obs. 3, 4.

In *United States* v. *Robinson*, 4 Mason, 307, which was an indictment on the act of March 26, 1804, c. 40, (2 Stat. 290,) for destroying a vessel " on the high seas" with intent to defraud the underwriters, Mr. Justice Story held that a land-locked bay in Bermuda could not be considered as the high seas. And, under the same statute, Mr. Justice Nelson and Judge Betts held that a vessel in the East River, or western extremity of Long Island Sound, was not upon the high seas. *United States* v: *Wilson*, 3 Blatchford, 435.

The Crimes Act of March 3, 1825, c. 65, was drafted by Mr. Justice Story, to supply the defects of former acts. 2 Story's Life of Story, 297, 437, 439, 440; 2 ib. 402. That act, in sections 4, 6–8, 11 and 22, provided for the punishment of murder, of assaults with a dangerous weapon or with intent to kill, and of various other crimes, "upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin or bay," thus covering all tide waters, including a dock or basin, or a land-locked bay, in which the tide ebbs and flows from

the sea, though in a foreign State, if "within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular State" of the Union.    4 Stat. 115–118, 122.

In *United States* v. *Grush*, 5 Mason, 290, which was an indictment on the provision of section 22 of the act of 1825, (reënacted in the very section of the Revised Statutes now in question,) for an assault with a dangerous weapon and with intent to kill, Mr. Justice Story, in deciding that a place in Boston Harbor within the body of a county was a bay or haven or arm of the sea, but was not the high seas, said: ".There cannot, I think, be any doubt as to what is the true meaning of the words 'high seas' in this statute.    Mr. Justice Blackstone, in his Commentaries, (1 Com. 110,) uses the words 'high sea' and 'main sea' (*altum mare,* or *le haut meer*) as synonymous; and he adds, 'that the main sea begins at the low water mark.'    But though this may be one sense of the terms, to distinguish the divided empire, which the admiralty possesses between high water and low water mark, when it is full sea, from that which the common law possesses, when it is ebb sea; yet the more common sense is, to express the open, unenclosed ocean, or that portion of the sea, which is without the *fauces terræ* on the sea-coast, in contradistinction to that, which is surrounded, or enclosed between narrow headlands or promontories."    And, after referring to *United States* v. *Wiltberger,* above cited, and other authorities, he concluded: "From this view of the subject, I am entirely satisfied, as well upon the language of the authorities, as the descriptive words in the context, that the words 'high seas' in this statute are used in contradistinction to arms of the sea, and bays, creeks, &c., within the narrow headlands of the coast; and comprehend only the open ocean, which washes the sea-coast, or is not included within the body of any county in any particular State."    5 Mason, 297–299.

: Here we have the deliberate opinion of Mr. Justice Story, who had drafted the act, who had taken part in all the previous decisions of this court upon the subject, and who had often considered it at the circuit, that the words " high seas" in the very enactment now before us "comprehend only the

open ocean, which washes the sea-coast, or is not included within the body of any county in any particular State."

So Chancellor Kent says: "The high seas mean the waters of the ocean without the boundary of any county, and they are within the exclusive jurisdiction of the admiralty up to high water mark when the tide is full. The open ocean which washes the sea-coast is used in contradistinction to arms of the sea enclosed within the *fauces terræ*, or narrow headlands and promontories: and under this head are included rivers, harbors, creeks, basins, bays, &c., where the tide ebbs and flows." 1 Kent Com. 367.

If we turn to the principal American dictionaries, we find the following definitions of "high seas": In Worcester, "*high seas*, the open ocean." In Webster, "*high seas, (law)* the open sea; the part of the ocean not in the territorial waters of any particular sovereignty, usually distant three miles or more from the coast line." In the Century Dictionary, "*high seas*" are defined as "the open sea or ocean; the highway of waters;" and, in law, either (1) the waters of the ocean to high water mark, or (2) those "not within the territorial jurisdiction of any nation, but the free highway of all nations, the waters of the ocean exterior to a line parallel to the general direction of the shore and distant a marine league therefrom;" and it is added: "The Great Lakes are not deemed high seas."

A fortnight after the passage of the act of 1825, this court, speaking by Mr. Justice Story, decided that the general admiralty jurisdiction of the courts of the United States was limited to tide waters. *The Thomas Jefferson*, 10 Wheat. 428. That decision was followed in 1833 in *Peyroux* v. *Howard*, 7 Pet. 324, in 1837 in *The Orleans*, 11 Pet. 175, and in 1847 in *Waring* v. *Clarke*, 5 How. 441. For more than half a century after the adoption of the Constitution, Congress took no step towards extending the admiralty jurisdiction beyond such waters. In the act of February 26, 1845, c. 20, extending that jurisdiction, in matters of contract and tort, "upon the lakes and the navigable waters connecting the same," Congress clearly treated those lakes and waters as distinct from, and not included within, "the high seas or tide waters." 5 Stat. 726.

And Congress never indicated any intention to extend the criminal jurisdiction of the courts of the United States " to the Great Lakes and the connecting waters " until three years after the assault alleged in the indictment in this case. Act of September 4, 1890, c. 874; 26 Stat. 424.

The judgment of this court in 1851, in *The Genesee Chief*, 12 How. 443, overruling *The Thomas Jefferson* and the cases which followed it, and holding the act of 1845 to be constitutional, did not proceed upon any assumption that the Great Lakes were " high seas ; " but upon the broad ground that " the lakes and the waters connecting them are undoubtedly public waters," and therefore " within the grant of admiralty jurisdiction in the Constitution of the United States." 12 How. 457. Chief Justice Taney, in delivering that judgment, clearly distinguished the Great Lakes from the high seas. This appears in his statement of the question whether " the admiralty jurisdiction, in matters of contract and tort, which the courts of the United States may lawfully exercise on the high seas, can be extended to the lakes, under 'the power to regulate commerce; " as well as in his pregnant observations, " These lakes are, in truth, inland seas. Different States border on them on one side, and a foreign nation on the other." 12 How. 452, 453.

So in *The Eagle*, 8 Wall. 15, in which it was decided that the admiralty jurisdiction over all navigable waters, having been declared in *The Genesee Chief* to depend upon the Constitution, and not upon any act of Congress, extended to the British side of the Detroit River, Mr. Justice Nelson, speaking for this court, observed the same distinction, saying that the District Courts could take cognizance of " all civil causes of admiralty jurisdiction upon the lakes and waters connecting them, the same as upon the high seas, bays, and rivers navigable from the sea." 8 Wall. 21.

The lakes are not high seas, for the very reason that they are inland seas, within the exclusive jurisdiction and control of those countries within whose territories they lie, or between whose territories they are the boundary ; and therein essentially differ from " the high seas, where the law of no particu-

lar State has exclusive force, but all are equal." Bradley, J., in *The Scotland*, 105 U. S. 24, 29.

The distinction is familiar and well established in international law.

As was said by Sir William Scott: "In the sea, out of the reach of cannon shot, universal use is presumed; in rivers flowing through conterminous States, a common use to the different States is presumed." *The Twee Gebroeders*, 3 C. Rob. 336, 339.

In a case in which a municipal seizure under the Customs Act of March 2, 1799, c. 22, § 29, (1 Stat. 649,) in the St. Mary's River, then forming the boundary between the United States and the Spanish territory, of a vessel bound up that river to the Spanish waters and Spanish possessions, was held unlawful, Mr. Justice Story, speaking for this court, said that, " upon the general principles of the law of nations, the waters of the whole river must be considered as common to both nations, for all purposes of navigation, as a common highway, necessary for the advantageous use of its own territorial rights and possessions;" and he distinguished the waters of the river, common to the two nations between whose dominions it flowed, from " the ocean, the common highway of all nations." *The Apollon*, 9 Wheat. 362, 369, 371.

Vattel says: " The open sea is not of a nature to be possessed, no one being able to settle there so as to hinder others from passing over it." Vattel, lib. 1, c. 23, § 280. " No nation, therefore, has the right to take possession of the open sea, or to claim the sole use of it, to the exclusion of other nations." § 281. ".Every lake, entirely included in a country, belongs to the nation owning the country, which in possessing itself of a territory is considered as having appropriated to itself everything included in it; and, as it seldom happens that the property of a lake of considerable size falls to individuals, it remains common to the nation. If this lake is situated between two States, it is presumed to be divided between them at the middle, so long as there is neither title, nor constant and manifest custom, to determine otherwise." c. 22, § 274.

Wheaton says: " The sea cannot become the exclusive prop-

erty of any nation. And consequently the use of the sea, for these purposes," (navigation, commerce, and fisheries,) " remains open and common to all mankind." Wheaton's International Law, (8th ed.,) § 187. " The territory of the State includes the lakes, seas and rivers, entirely enclosed within its limits. The rivers which flow through the territory also form a part of the domain, from their sources to their mouths, or as far as they flow within the territory, including the bays or estuaries formed by their junction with the sea. Where a navigable river. forms the boundary of conterminous States, the middle of the channel is generally taken as the line of separation between the two States, the presumption of law being that the right of navigation is common to both; but this presumption may be destroyed by actual proof of prior occupancy and long undisturbed possession, giving to one of the riparian proprietors the exclusive title to the entire river." § 192.

Phillimore, after observing that " no difficulty can arise with respect to rivers and lakes entirely enclosed within the limits of a State," and discussing the rights in rivers which flow through more than one State, and the rights in the open sea, in narrow seas or straits, and. in portions of the sea next the coast or. between headlands, says: " With respect to seas entirely enclosed by the land, so as to constitute a salt-water lake, the general presumption of law is, that they belong to the surrounding territory or territories in as full and complete a manner as a fresh-water lake. The Caspian and the Black Sea naturally belong to this class." And he proceeds to show that the rights of other nations than Turkey and Russia to navigate the Black Sea from the Mediterranean rest upon treaties only. 1 Phillimore's International Law, (3d ed.) c. 5, § 155; c. 8, §§ 205, 205A. See also Wheaton, § 182 and note; Treaty of 1862 of the United States with the Ottoman Empire, art. 11, 12 Stat. 1216.

The Mediterranean Sea, opening directly into the Atlantic Ocean at the Straits of Gibraltar, and washing the shores of many countries of different sovereigns, has, excepting such portions thereof as the Gulf of Venice or the Straits of Mes-

·sina, been recognized and considered by all nations for centuries as part of the high seas, free to all mankind. Martens, Précis du Droit des Gens, § 42; Wheaton, § 190. And it was the one sea familiarly known to the ancients as *altum mare*, the deep sea or "high sea," or simply *altum*, the deep.

The freedom of the Baltic Sea, and of the Sound connecting it with the North Sea, long and earnestly controverted, was finally established in 1857 by a treaty of the five powers whose territories bordered thereon with other European nations, and by a separate treaty between the United States and Denmark. Wheaton, §§ 183–185, 187 note; 1 Phillimore, c. 5, § 179; c. 8, § 206; 11 Stat. 719.

As to the Great Lakes of North America, there has never been any doubt. They are in the heart of the continent, far above the flow of the tide from the sea. Lake Michigan is wholly within the limits and dominion of the United States, and of those States of the Union which surround it. *Illinois Central Railroad* v. *Illinois*, 146 U. S. 387; 6 Opinions of Attorneys General, 172. The middle line of Lakes Superior, Huron, Erie and Ontario, and of the waters connecting them, forms part of the boundary between the United States and the State of Michigan and other States of the Union, on the one hand, and the British possessions in Canada, on the other. Treaties of Paris in 1783, art. 2, and of Ghent in 1814, art. 6, and Decision of Commissioners under this article; 8 Stat. 81, 221, 274; Charters and Constitutions, 994, 1453, 2026. No other nation has the right to navigate them, except by the permission, and subject to the laws, of the United States and Great Britain, respectively. The controversy between the United States and Great Britain as to the right of navigating the river St. Lawrence turned upon the effect to be given to the fact that one side of the Great Lakes and of the waters connecting them belonged to each country, as against the fact that both shores of the St. Lawrence below belonged to Great Britain; and it was never suggested that any third nation had a free and common right of navigation of the lakes and their connecting waters. On the contrary, the exclusive right of the United States and Great Britain to navigate the lakes was

made the basis of the American claim to the navigation of the river. On June 19, 1826, Mr. Clay, Secretary of State under President John Quincy Adams, in a letter to Mr. Gallatin, then Minister to England, said: "The United States and Great Britain have, between them, the exclusive right of navigating the lakes. The St. Lawrence connects them with the ocean. The right to navigate both (the lakes and the ocean) includes that of passing from the one to the other through the natural link." Congressional Documents, 1827–28, No. 43, p. 19; Wheaton, § 205. The right of citizens of the United States to navigate the St. Lawrence, as well as a right to British subjects to navigate Lake Michigan, was secured by treaties between the two countries in 1854 and 1871. 10 Stat. 1091; 17 Stat. 872. See also Act of July 26, 1892, c. 248, 27 Stat. 267; 1 Wharton's International Law Digest, §§ 30, 31.

No instance has been produced, in which the words "high seas" have been used to designate fresh inland waters, the entire jurisdiction and control of which belong to those nations within whose territories they lie, or between whose territories they form the boundary.

The conclusion seems to me inevitable that no part of the Great Lakes can be held to be "high seas," within the meaning of section 5346 of the Revised Statutes.

The language of this section, immediately following the term "the high seas," is "or in any arm of the sea, or in any river, haven, creek, basin or bay." It is quite clear that the Detroit River is not an "arm of the sea," or a "haven, creek, basin or bay." Is it a "river," within the meaning of this enactment?

Upon this point I agree with the rest of the court that the language used must be read in conjunction with the term "the high seas," and as referring to waters connecting with the high seas mentioned; and that Congress cannot be supposed to have intended to include fresh-water rivers, and not to include the lakes from or into which they flow, and which, together with them, form a continuous passage for vessels. But if the lakes are not "high seas," nor included in the act, the consequence would seem to be that the word "river" cannot be held to include a river connecting two of the lakes.

The question now before the court is not one, arising in a civil proceeding, of the extent of the general and comprehensive grant in the Constitution of "admiralty and maritime jurisdiction" to the courts of the United States. But it is a question, arising in a criminal prosecution, of the construction of particular words in a penal statute, which cannot be extended by the court to a similar or analogous case, not within their natural and obvious meaning.

The place in the Detroit River within the territorial limits of the Dominion of Canada, where this offence is alleged to have been committed, was doubtless "within the admiralty jurisdiction of the United States," under the decision in *The Genesee Chief*; and was "out of the jurisdiction of any particular State," under the decision in *United States* v. *Brailsford*, 5 Wheat. 184, 189, 200, already cited. Nor is there any doubt of the power of Congress to punish crimes committed on American vessels, wherever they may be afloat. *United States* v. *Furlong*, 5 Wheat. 184, 194; *Crapo* v. *Kelly*, 16 Wall. 610, 624–626.

But, in order to come within the statute, it is not enough that the offence was committed "within the admiralty jurisdiction of the United States;" and "out of the jurisdiction of any particular State" of the Union; and upon a vessel belonging in whole or in part to the United States, or to a citizen thereof. It must also be covered by the description, "upon the high seas, or upon any arm of the sea, or in any river, haven, creek, basin or bay."

The leading words of this description are applicable to nothing but the ocean and its adjacent waters within the ebb and flow of the tide; every word in the description aptly designates tide waters; all the words, taken together, point to tide waters; and no other waters come within their natural and obvious meaning, in the connection in which they are used. The evident intention of Congress, to be collected from the words it employed, was to punish offences upon the sea, and upon any waters forming part of the sea, or immediately connecting with it, as far as high water mark, and not within the jurisdiction of any State of the Union; and the whole object

and effect of adding, after the "high seas," the words "or in any arm of the sea, or in any river, haven, creek, basin or bay," were to cure the defects of earlier statutes in this respect, and to include all waters within the ebb and flow of the tide, which are estuaries or approaches of the high seas or open ocean.

Upon this part of the case, the decision of this court in *United States* v. *Bevans*, 3 Wheat. 336, is much in point. That was an indictment for a murder committed by a marine upon another enlisted man on a ship of war of the United States lying in the harbor of Boston, and so within the territorial jurisdiction of the State of Massachusetts, and therefore, as the court held, not coming within the description in section 8 of the act of April 30, 1790, c. 9, "upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular State." But the jurisdiction of the Circuit Court of the United States was also sought to be maintained under the provision of section 7 of the same act, for the punishment of murder committed "within any fort, arsenal, dockyard, magazine, or other place or district of country, under the sole and exclusive jurisdiction of the United States." 1 Stat. 113. It was argued that a ship of war of the United States was "a place under the sole and exclusive jurisdiction of the United States," and therefore within the act. But this court, speaking by Chief Justice Marshall, held otherwise; and, while waiving a decision of the question whether any court of Massachusetts would have jurisdiction of the offence; and recognizing as unquestionable the power of Congress to punish an offence committed by a marine on board a ship of war, wherever she may be; nevertheless held that Congress had not exercised that power by the provision last quoted, because the objects with which the word "place" was associated — "fort, arsenal, dockyard, magazine," and "district of country" — being all fixed and territorial in their character, "the construction seems irresistible that, by the words 'other place' was intended another place of a similar character with those previously enumerated, and with that which follows," and "the context shows the mind of the legislature

to have been fixed on territorial objects of a similar character."
3 Wheat. 390, 391.

Applying the same rule of construction, *noscitur a sociis*, to
the enactment now before the court, the conclusion seems irre-
sistible that, as the preceding words, " upon the high seas, or in
any arm of the sea," as well as the succeeding words, " haven,
creek, basin or bay," designate tide waters of or adjoining the
ocean, the words " any river" must be held to designate
waters of a similar character, that is to say, those rivers only
where the tide ebbs and flows, and which are immediately
connected with the sea or with one of the other waters enum-
erated, and cannot be extended to a fresh-water river in the
interior of the continent, because the context shows the mind
of the legislature to have been fixed on tide waters.

Should there be any doubt of the soundness of this construc-
tion, that doubt, in interpreting a penal statute, should be
solved in favor of the defendant.

In *United States* v. *Wiltberger*, cited at the beginning of this
opinion, in which, as in *United States* v. *Bevans*, just cited,
and in the case at bar, the question was of the meaning of
words, not defining the elements of the crime itself, but only
describing the place of its commission, Chief Justice Marshall
expounded the rule of construction of penal statutes as fol-
lows : " The rule, that penal laws are to be construed strictly,
is perhaps not much less old than construction itself. It is
founded on the tenderness of the law for the rights of individ-
uals ; and on the plain principle that the power of punishment
is vested in the legislative, not in the judicial department. It
is the legislature, not the court, which is to define a crime, and
ordain its punishment." " Though penal laws are to be con-
strued strictly, they are not to be construed so strictly as to
defeat the obvious intention of the legislature. The maxim
is not to be so applied as to narrow the words of the statute
to the exclusion of cases which those words, in their ordinary
acceptation, or in that sense in which the legislature has obvi-
ously used them, would comprehend. The intention of the
legislature is to be collected from the words they employ."
" To determine that a case is within the intention of a statute,

its language must authorize us to say so. It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated." 5 Wheat. 95, 96. And in answer to the suggestion made in that case (which has been repeated in this) of "the extreme improbability that Congress could have intended to make those differences with respect to place, which their words import," the Chief Justice said: "We admit that it is extremely improbable. But probability is not a guide which a court, in construing a penal statute, can safely take. We can conceive no reason why other crimes, which are not comprehended in this act, should not be punished. But Congress has not made them punishable, and this court cannot enlarge the statute." 5 Wheat. 105.

For these reasons, with all deference to the opinion of my brethren, I am constrained to conclude that the question certified should be answered in the negative.

MR. JUSTICE BROWN dissenting.

I am also constrained to dissent from the opinion of the court in this case, which appears to me to inaugurate a wholly new departure in the direction of extending the jurisdiction of the Federal courts. It is a matter of regret to me that this departure should be made in a case in which the defendant was represented neither by brief nor oral argument — a fact which suggests, at least, an unusual degree of caution in dealing with the question involved.

I had supposed that, in criminal cases, the accused was entitled to the benefit of any reasonable doubt, not only with regard to the evidence of guilt, but with regard to the jurisdiction of the court; in other words, that penal statutes should be construed strictly; and that the facts that the Supreme Court of Michigan, in a very carefully considered case some thirty years ago, *People* v. *Tyler*, 7 Michigan, 161, had decided that the criminal jurisdiction of the Federal courts did not

extend to the lakes; that the same question had been decided the same way by Judge Wilkins in *Miller's case*, Brown's Adm. 156; that the Federal courts upon the lakes had uniformally acquiesced in these decisions; and that no case is reported to the contrary, would of itself make a case of reasonable doubt, to the benefit of which the prisoner would be entitled.

I fully concur in all that has been stated in the opinion of the court with regard to the magnitude of the commerce upon the lakes; and if that question were pertinent here, it would doubtless be controlling. Having lived for thirty years within sight of this commerce, it would ill become me to depreciate its importance; but it occurs to me that if this were a consideration at all it would be equally applicable to our jurisdiction over the Hudson, the Ohio, and the Mississippi, upon all of which the commerce is of great magnitude. I had assumed that the question at issue involved simply the construction of a statute, and not the magnitude of the commerce upon the lakes.

My own views on this question were so fully set forth in the case of *Byers*, 32 Fed. Rep. 404, that I can add but little to what was there said. Revised Statutes, § 5346, under which this indictment was framed, limits the jurisdiction of the District Court to "cases arising upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin or bay within the admiralty jurisdiction of the United States, *and out of the jurisdiction of any particular State.*"

The first question which arises, then, is as to whether the lakes are "high seas," and as to that I had supposed, until reading the opinion of the court in this case, there could be but one answer.

The term "high seas" has never been regarded by any public writer or held by any court to be applicable to *territorial* waters, and, like the word "highways," presupposes the right of the public to make free use of them, and excludes the idea of private ownership. Of the sea, Lord Hale says (*De Jure Maris*, chapter 4): "The sea is either that which lies within the body of the county or without. That arm or branch of the sea which lies within the *fauces terræ*, where

a man may reasonably discern between shore and shore, is, or at least may be, within the body of a county, and therefore within the jurisdiction of the sheriff or coroner. The part of the sea which lies not within the body of a county, is called the main sea or ocean."

Azuni, an Italian publicist of the last century, in writing of the maritime law of Europe, says (Part 1, chapter 1, section 12): "The sea belongs to no one; it is the property of all men; all have the same equal right to its use as to the air they breathe, and to the sun that warms them. Seas are the great highways traced by nature between the different parts of the world, to facilitate and expedite communication between the various nations who inhabit it. If a nation seizes on these highways, if it arrogates to itself the exclusive privilege of traversing them without opposition, and repels, by the fear of being plundered, all those who wish to make the same use of them, it is no better than a nation of robbers." Section 14: "The liberty of navigation and of fishing is derived from natural law, and the law of nations, as well as from the civil law. For these reasons, the high seas ought to remain as common to the human race as air and light. The use of those elements, unquestionably, can never belong to any one nation, to the exclusion of others." Section 15: "From these principles, it follows, that the right of prior occupancy cannot give to a nation the absolute empire of the high sea, and for the reason already mentioned, that this element is not susceptible of individual appropriation."

Valin, in his commentary on the Marine Ordinance, observes: "For in short the ocean belongs to no one, and the conclusion undoubtedly to be drawn from this is that all nations are permitted to navigate it."

So Vattel, in speaking of the sea (Book 1, chapter 23, section 281): "But this," speaking of private property, "is not the case with the open sea, on which people may sail and fish without the least prejudice to any person whatsoever, and without putting any one in danger. No nation, therefore, has a right to take possession of the open sea, or claim the sole use of it, to the exclusion of other nations. . . . Nay,

more, a nation, which, without a legitimate claim, would arro-
gate to itself an exclusive right to the sea, and support its
pretensions by force, does an injury to all nations; it infringes
their common right; and they are justifiable in forming a
general combination against it, in order to repress such an
attempt."

So Chancellor Kent, in speaking of jurisdiction over the
seas, Part 1, Lecture 2, says: "The open sea is not capable
of being possessed as private property. The free use of the
ocean for navigation and fishing is common to all mankind,
and the public jurists generally and explicitly deny that the
main ocean can ever be appropriated. The subjects of all
nations meet there, in times of peace, on a footing of entire
equality and independence. No nation has any right or juris-
diction at sea, except it be over the persons of its own sub-
jects in its own public and private vessels." 1 Kent Com. 26.

From time immemorial the term "high seas" has been used
to import the unenclosed and open ocean without the *fauces
terræ*. In *United States* v. *Bevans*, 3 Wheat. 336, a homicide
had been committed upon an American man-of-war lying
at anchor in the main channel of Boston harbor, to which
there is at all times a free and unobstructed passage to the
open ocean. The language of the statute was practically the
same as in this case; but it was held by this court, speaking
through Chief Justice Marshall, that to bring the defendants
within the jurisdiction of the courts of the Union the murder
must have been committed in a river, etc., *out of the jurisdic-
tion of any State*, and that as the jurisdiction of a State was
coextensive with its territory and with its legislative power, the
courts of Massachusetts had exclusive jurisdiction of the crime.
It was further held that whatever might be the constitutional
power of Congress, it was clear that this power had not been
exercised so as to confer upon its courts jurisdiction over any
offences committed within the jurisdiction of any particular
State. In *United States* v. *Wiltberger*, 5 Wheat. 76, it was held
that the courts of the United States had no jurisdiction of a
manslaughter committed on a merchant vessel of the United
States lying in the river Tigris, in the Empire of China. It

was held in this case that the homicide was not committed on the "high seas."

In *United States* v. *Jackalow*, 1 Black, 484, it was said by this court that to give a Circuit Court of the United States jurisdiction of an offence not committed within its district, it must appear that the offence was committed *out of the jurisdiction of any State;* and not within any other district of the United States. This was applied to an offence committed in Long Island Sound, one and a half miles from the Connecticut shore at low water mark.

So in *Miller's case*, 1 Brown's Adm. 156, it was held by Judge Wilkins of Michigan that while it was within the constitutional competency of Congress to define and punish offences when committed upon other waters than the high seas, it had not done so, and that Lake Erie was not a part of the high seas. This was applied to a shocking case of an attempt to burn a passenger steamer upon Lake Erie.

But it seems to me, without going further into the authorities, that the term "high seas" is accurately defined by the statute under which this indictment is framed as "waters within the admiralty and maritime jurisdiction of the United States and out *of the jurisdiction of any particular State."*

The underlying error of the opinion of the court in this case appears to me to consist in a total ignoring of the last qualification. That the term "high seas" extends to what are known as the great oceans of the world there can be no doubt. I presume it also extends to the Mediterranean Sea, for the reason that, bordering so many nations as it does, a division of the waters between these nations would be impracticable. Whether, as stated in the opinion of the court, the term also extends to the Black Sea, there seems to be grave doubt; but if it does, it is because the waters of the Black Sea are not proprietary waters, are not claimed by Russia or Turkey as being a part of their territory. The very idea of giving to the courts of all nations jurisdiction over the high seas arises primarily from the fact that they belong to no particular sovereignty. If it be true that the lakes are high seas, it logically follows that any European power may punish a crime com-

mitted upon the lakes in their own courts, whenever it is able to lay hands upon the offender. It would also follow that other nations than England and America would have the right to navigate these seas without any local restrictions, and even to send their fleets there and perhaps to engage in hostilities upon its waters. In the case of *The Genessee Chief*, 12 How. 443, this court did not hold that the lakes were high seas, but that the limitation of the admiralty jurisdiction in civil cases to tide waters did not apply to this country, or to the interior lakes, a doctrine in which I fully concur, and one that has met with the practically unanimous approval of the profession.

The difficulty of applying the term "high seas" to the lakes arises not from the fact that they are not large enough, that the commerce which vexes their waters is not of sufficient importance, but from the fact that they are within the local jurisdiction of the States bordering upon them. By the treaty of peace between this country and Great Britain, of 1783, the boundary line between the United States and Canada was fixed in the middle of Lake Ontario, Niagara River, Lake Erie, Detroit River, Lake Huron, St. Mary's River, and Lake Superior, and by the treaty of 1814 this line was recognized and subsequently designated by commissioners appointed for that purpose. So in the acts admitting Illinois, Wisconsin, and Michigan into the Union the boundary lines of these States were fixed at the middle of Lake Michigan, and as to the State of Michigan at the boundary line between the United States and Canada. Acting upon this theory, the State of Michigan has assumed jurisdiction of all crimes committed upon her side of the boundary line, and provided for their punishment in certain counties irrespective of the question whether the crimes were committed within the limits of a particular county.

But even if the lakes were to be considered as high seas, that term surely cannot be applied to a river twenty-two miles in length and less than a mile in width, connecting the two lakes.

The further question then arises whether the locality in

question is covered by the words "in any arm of the sea, or in any river, haven, creek, basin, or bay within the admiralty jurisdiction of the United States and out of the jurisdiction of any particular State.". As the western half of the Detroit and St. Clair rivers is within the territorial jurisdiction of Michigan, it only remains to consider whether the fact that the eastern half of these rivers is within the territorial jurisdiction of Canada meets the requirements of the statute. I may say that this question was elaborately considered by the Supreme Court of Michigan in the case of *People* v. *Tyler*, 7 Michigan, 161, which was also the case of an assault committed on the Canadian side of the boundary line, in which the Federal court, without an investigation of the question, had convicted Tyler. The Supreme Court of Michigan were unanimous in the opinion that the jurisdiction did not exist. Separate opinions were delivered by three of the judges, in which every possible case bearing upon the question was cited and criticised. I have no doubt whatever of the power of Congress to extend its jurisdiction to crimes committed upon navigable waters. Indeed, since the decision in *Byers' case*, and on September 4, 1890, Congress did pass an act providing for the punishment of crimes committed anywhere upon the lakes. 26 Stat. 424, c. 874. 1 Supp. Rev. Stat. 799.

But, considering that, at the time the act of Congress in question was passed, viz., in 1790, the lakes were far beyond the bounds of civilization and possessed no commerce, except such as was carried on in canoes, it seems impossible to say that Congress intended that the words "arm of the sea, or river, haven, creek, basin, or bay" could have been intended to apply to the lakes when the word "lakes" might just as well have been used, had the interior waters of the country been included. It seems to me entirely clear that the words alluded to, following immediately the words "high seas," apply only to such waters as are connected immediately with the high seas, and have no application to the Great Lakes. This was evidently the view taken by Congress in the enactment of 1890.

I may add in this connection that the act of 1790, under

which this indictment was framed, was before Congress at the time of the passage of the Crimes Act of 1825, and also at the time of the adoption of the Revised Statutes, and no effort was made to change the language of the act by inserting the word "lakes," and no such change was ever made until after the offence in this case had been committed.

The conclusion seems to me irresistible that, considering the words high seas are followed by the words "in any arm of the sea, or in any river, haven, creek, basin, or bay within the admiralty jurisdiction of the United States and out of the jurisdiction of any particular State," they should be limited to such waters as are directly connected with the high seas. It is incredible that if Congress had intended to include the lakes in either of these acts it would have drawn a line through the centre, and given to the Federal courts jurisdiction upon one side of that line, and not upon the other, when it was equally within its competency to confer full jurisdiction over all crimes committed upon American vessels upon the entire lakes. Especially is this true in view of the fact that it is often impossible to locate the ship at the time the crime is committed upon one side or the other of the boundary line.

It is beyond question in this case that the crime charged was committed within the waters of the Province of Ontario; that the courts of such Province had jurisdiction of the cause, and in my opinion such jurisdiction was exclusive.